This opinion is uncorrected and subject to revision before publication in the New York Reports.
----------------------------------------------------------------

No. 122
Nomura Asset Capital Corporation,
et al.,
         Respondents-Appellants
         v.
Cadwalader, Wickersham & Taft
LLP,
         Appellant-Respondent.

David R. Marriott, for appellant-respondent.
James T. Potter, for respondents-appellants.

RIVERA, J.:

On these cross appeals from an order granting partial summary judgment in a legal malpractice action, we conclude that no triable issues of fact exist with respect to the first cause of action, which alleges that counsel failed to properly advise and conduct requisite due diligence in a mortgage securitization

- 1 -

matter.   Therefore, we modify the Appellate Division order, grant summary judgment to dismiss the first cause of action in its entirety, and otherwise affirm.

**I.**

At times relevant to this appeal, plaintiffs, Nomura Asset Capital Corporation and Asset Securitization Corporation (Nomura), and defendant, the law firm of Cadwalader, Wickersham & Taft, LLP (Cadwalader), were working in the mortgage securitization field.  In this industry, an investment bank sources and funds mortgages on properties with the objective of aggregating the mortgages into securitization pools.  The loans are then sold to a trust, which issues securities in the form of certificates to investors. The certificates entitle the holders to a portion of the revenue stream produced by payments made by the mortgage borrowers.[1]

Nomura established a commercial mortgage-backed securities business,[2] and engaged Cadwalader to advise and confirm that Nomura's securitized commercial mortgage loans qualified as

---

[1] See Baxter Dunaway, Asset Securitization and Commercial Mortgage-Backed Securities, 5 L. Distressed Real Est. § 56:1.

[2] Commercial Mortgage-Backed Securities are "[s]ecurities collateralized by a pool of mortgages on commercial real estate in which all principal and interest from the mortgages flow to certificate holders." The pools are secured by loans on commercial properties. (Id.)

real estate mortgage investment conduit (REMIC) trusts.[3]   Over
the course of several years, Cadwalader's work on Nomura REMIC
securitizations garnered immense profits for Nomura and
significant legal fees for Cadwalader.  However, the professional
relationship soured when a 1997 REMIC securitization, known as
the Series 1997-D5 securitization (D5 securitization), embroiled
Nomura in federal litigation and demands for a buy-back of a
defaulted loan.  In an attempt to recoup its losses associated
with the federal lawsuit, Nomura commenced the underlying legal
malpractice action against Cadwalader, alleging that Cadwalader
failed to provide appropriate legal advice and perform necessary
due diligence concerning the REMIC eligibility of the D5
securitization.

Now, almost two decades since the events leading to the
original securitization, and almost ten years since Nomura filed
this action, the case has reached this Court, and we are
presented with the question whether Cadwalader is entitled to
summary judgment as to all or part of the first cause of action.
For the reasons set forth below, we conclude that Cadwalader has
established, as a matter of law, that summary judgment and
dismissal of the legal malpractice cause of action are merited in
this case.

---

[3] REMIC qualification is advantageous because it allows the
trust to be treated as a pass-through entity and claim certain
tax exemptions (see 26 USC § 860A).

## II.

We begin our analysis with a discussion of the relevant legal requirements for REMIC qualification of the D5 securitization, and the events leading up to Cadwalader's opinion as to the REMIC eligibility of the mortgage loan at the center of the parties' dispute. The D5 securitization consists of 156 loans, secured by first liens on 220 commercial and multi-family properties. For these mortgage loans to be pooled in a REMIC-qualified trust they had to be in compliance with certain federal Internal Revenue Code (Code) requirements, including that substantially all of the assets be "qualified mortgages and permitted investments" within the meaning of the Code (26 USC § 860D [a] [4]).

Under the Code, a "qualified mortgage" is "principally secured by an interest in real property" (26 USC § 860G [a] [3] [A]), which in accordance with federal tax regulations, requires that "the fair market value of the interest in real property securing" the mortgage is "at least equal to 80 percent of the adjusted issue price" of the loan, as of the loan origination date or when the REMIC sponsor contributes the loan to the trust (26 CFR 1.860G-2 [a] [1] [i], [a] [5]). This is known as the "80% test."

Although pursuant to the federal regulations the 80% test is based on a value-to-loan ratio (VTL) (see 26 CFR 1.860G-2 [a] [1] [i], [a] [5]), the parties agree that mortgage lenders,

such as Nomura, typically utilize a loan-to-value ratio (LTV) for underwriting purposes, and that Nomura understood that an 80% VTL is equal to a 125% LTV.[4]  However, the LTV is based on the overall value of property, whereas the regulations define REMIC real property as "land or improvements thereon, such as buildings or other inherently permanent structures . . ." (26 CFR 1.856-3 [d]).  It does not include personal property (id.).

One of the mortgages included in the D5 trust was a $50 million loan secured by the Doctor's Hospital of Hyde Park (hospital), an acute care facility located in Chicago.  In order to be REMIC-qualified and in compliance with the warranties set forth in the Pooling Service Agreement (PSA) and Mortgage Loan Purchase and Sale Agreement (MLPSA), the real property value for the hospital had to be appraised at a minimum of $40 million.[5] Nomura's appraiser estimated the hospital property's market value at $68 million, based on a valuation of $3 million for the land, $27,960,000 for improvements, $9,640,000 for equipment, and $27,400,000 for intangibles.  Although not set forth in the

---

[4] Value-to-loan ratio is calculated by dividing the value of the property by the amount of the loan.  The inverse, loan-to-value, is determined by dividing the loan amount by the property's value.  Based on the mathematical equations, a loan with a low LTV percentage presents less risk to the lender because the property securing the loan has a high value as compared to the loan amount.

[5] The Mortgage Loan Purchase and Sale Agreement (MLPSA) and Pooling Service Agreement (PSA) are the agreements by which Nomura sold, pooled, and transferred the loans to the trust.

appraisal, a property valued at $68 million with a $50 million mortgage has an LTV of 73%, and therefore appears to be REMIC-qualified.

The final appraisal was determined after a reconciliation of three valuation approaches: "income capitalization," "sales comparison," and "cost."  The "income capitalization approach" resulted in an estimated valuation of the hospital property at $68 million, based on a 21.5% capitalization rate of the hospital's net operating income ($8,012,677), determined by gross annual income, minus operating expenses.  The "sales comparison" resulted in an estimated value of $64 million, based on the cost of acquiring an equally desirable substitute property.  The "cost approach" estimated the property at $40.6 million, based on the value of the land as vacant ($3 million), replacement costs of buildings ($27,761,163), and depreciation of improvements and equipment ($180,000 and $9,640,000, respectively).

The appraisal lacked a detailed breakdown of the hospital equipment included in the property valuation, and instead applied figures for similar acute care hospitals. However, because not all types of equipment count for REMIC purposes, the lack of detail arguably left unclear whether the appraisal could provide a reasonable basis for determining REMIC qualification.  Although the land, building, and improvements, valued by the appraiser at $30,960,000, would count under the

REMIC standards, they failed to meet the $40 million minimum required under the 80% test.  Nevertheless, Nomura relied on this appraisal, as written.

It is undisputed that prior to the closing on the D5 securitization, Nomura did not provide, Cadwalader did not request, and no one at Cadwalader ever reviewed or even saw the actual appraisal for the hospital, or, for that matter, for any other D5 securitization mortgage loan.  Nomura did fax to an associate at Cadwalader, approximately 24 days before the D5 closing, a freestanding asset description report prepared by Nomura's bankers for credit purposes, titled "Doctor's Hospital of Hyde Park Deal Highlights" (highlights document).  The highlights document stated that the $50 million loan was secured by "the land, building, and operations of the property" and that the collateral was the hospital's "land, building and property management (operations)."  It set forth an LTV at 73.5%.  It also listed the appraiser's reconciled valuation of $68 million, as well as the three valuation approaches.

In preparation for the closing, Cadwalader provided an opinion letter to Nomura stating that the D5 Series was REMIC-qualified. Cadwalader stated that its legal conclusion was based on the information contained in the PSA, MLPSA, Prospectus, and two supplements.  The letter also specifically stated that "as to any facts material to such opinions not known to" Cadwalader, it relied on "statements, certificates and representations" of

Nomura officers and representatives.  There was no mention of the highlights document.

Cadwalader also drafted the D5 securitization's PSA and MLPSA.  The PSA and the MLPSA stated specifically that Nomura warranted that each mortgage loan is a "qualified mortgage" within the meaning of the Code, and that the loans in the trust were secured by mortgages on real property with a fair market value of at least 80% of the principal amount of the loan, as measured at the origination or closing date.  In other words, that the mortgage loans in the D5 securitization complied with the 80% test.

**III.**

Approximately three years after the closing, the hospital went bankrupt and defaulted on its loan.  Thereafter, the D5 securitization trustee notified Nomura that the hospital property was insolvent and that Nomura was in breach of the PSA and MLPSA warranties because the hospital's property value was below the 80% REMIC minimum.  Nomura refused to repurchase the loans and submitted letters from Cadwalader and the appraiser stating that the hospital had an overall REMIC-qualified market value of $45,080,000.

Unpersuaded by these representations, the trustee commenced a federal action against Nomura in the District Court for the Southern District of New York, for the alleged breach of the PSA and MLPSA.  The District Court granted Nomura summary

judgment, concluding that based on Cadwalader's opinion letter, Nomura reasonably believed the property met the 80% REMIC test (see LaSalle Bank N.A. v Nomura Asset Capital Corp., 2004 WL 2072501 [SD NY, Sept. 14, 2004]).  The Second Circuit Court of Appeals reversed, finding that Nomura could be liable, notwithstanding the opinion letter or other provisions in the PSA and MLPSA, and remanded the matter to district court for a factual determination of whether the fair market value of the hospital was less than 80% of the loan (see LaSalle Bank Nat. Ass'n v Nomura Asset Capital Corp., 424 F3d 195, 208 [2d Cir 2005]).[6]  Prior to trial, Nomura settled the federal action for $67.5 million.

Nomura then commenced the instant legal malpractice action in state court to recoup the settlement costs. In its complaint, Nomura asserted three causes of action, only the first of which is at issue in this appeal.[7]  Nomura alleged that Cadwalader committed malpractice because it failed to advise Nomura that the D5 appraisals had to separately value real

---

[6]The Second Circuit held that the Qualified Mortgage Warranty in the MLPSA needed to be satisfied without regard to what is known as a REMIC safe harbor provision.  As set forth in the REMIC regulations, under this "safe harbor," an obligation is "deemed" to meet the 80% test if the REMIC "sponsor" "reasonably believes" that to be so at the time it contributes the loan to the REMIC trust (Treas. Reg. § 1.860G-2 [a] [3] [i]).

[7]The second cause of action, involving the drafting of a provision of the MLPSA, was dismissed on Cadwalader's pre-answer motion to dismiss. Nomura withdrew the third cause action alleging malpractice with respect to another D5 loan.

property, as defined in the REMIC regulations, and, furthermore, that Cadwalader failed to perform the necessary due diligence to confirm that the D5 securitization was REMIC-qualified before issuing its pre-closing opinion letter.

Cadwalader moved for summary judgment, which Supreme Court denied (35 Misc 3d 1222 [A] [2012]). The court concluded that with respect to Nomura's "failure to advise" claim, triable issues of fact existed because Cadwalader relied on deposition testimony that raised credibility issues more appropriately addressed through cross examination. As to the due diligence claim, the court concluded that Cadwalader's evidence, including testimony from its own experts, was conflicting. The court also concluded that questions of fact existed as to whether Cadwalader's alleged malpractice proximately caused Nomura's damages.

The Appellate Division, in a 3-1 decision, modified the order of Supreme Court by dismissing the advice claim, and otherwise affirmed, but limited the due diligence claim to a factual issue related to the highlights document (115 AD3d 228 [2014]). The court concluded that Cadwalader had met its prima facie burden on the advice claim, based on the testimony of two Cadwalader partners and Nomura representatives, which demonstrated that Cadwalader provided Nomura with the advice on REMIC qualification, and that Nomura failed to establish a triable issue of fact on this claim. Regarding the due diligence

claim, the court concluded that Cadwalader had no generalized duty to review all of the appraisals in the D5 securitization, but that triable issues of fact existed as to whether the highlights document contained warning signs that the hospital loan may not have been REMIC-qualified, requiring further inquiry by Cadwalader.  The court also rejected Cadwalader's argument that Nomura could not establish proximate cause.

The dissent agreed with the court's analysis of the advice claim, but would have held that the due diligence claim was similarly without merit, and, therefore, Nomura's malpractice cause of action should be dismissed in its entirety.  The dissent would have found that the highlights document failed to demonstrate that the hospital loan was "more likely to be inappropriate . . . for inclusion in the securitization than any of the other loans" (id. at 108) simply because the face of the document revealed appraised values exceeding the REMIC threshold (id. at 114-115).  The dissent reasoned that had Cadwalader been required to further inquire based on the highlights document it would have had to "conduct due diligence for which its highly sophisticated investment-banking client had deliberately declined to engage it" (id. at 117).

The Appellate Division granted Cadwalader and Nomura's respective motions for leave to appeal to this Court, and certified the question whether the order, which modified the order of Supreme Court, was properly made.  We now answer the

certified question in the negative, and modify.


**IV.**

On a motion for summary judgment, the moving party must "make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to demonstrate the absence of any material issues of fact" (Alvarez v Prospect Hosp., 68 NY2d 320, 324 [1986]). If the moving party produces the requisite evidence, the burden then shifts to the nonmoving party " 'to establish the existence of material issues of fact which require a trial of the action' " (Vega v Restani Const. Corp., 18 NY3d 499, 503 [2012], quoting Alvarez, 68 NY2d at 324). Viewing the evidence "in the light most favorable to the non moving party," if the nonmoving party, nonetheless, fails to establish a material triable issue of fact, summary judgment for the movant is appropriate (Ortiz v Varsity Holdings, LLC, 18 NY3d 335, 339 [2011]; see Alvarez, 68 NY2d at 324).

To sustain its cause of action for legal malpractice, Nomura must "establish that [Cadwalader] failed to exercise the ordinary reasonable skill and knowledge commonly possessed by a member of the legal profession and that the attorney's breach of this duty proximately caused plaintiff to sustain actual and ascertainable damages" (Dombrowski v Bulson, 19 NY3d 347, 340 [2012] [internal citations and quotations omitted]). An attorney's conduct or inaction is the proximate cause of a

plaintiff's damages if "but for" the attorney's negligence "the plaintiff would have succeeded on the merits of the underlying action" (AmBase Corp. v Davis Polk & Wardwell, 8 NY3d 428, 434 [2007]), or would not have sustained "actual and ascertainable" damages (Dombrowski, 19 NY3d at 340; Brooks v Lewin, 21 AD3d 731, 734 [1st Dept 2005], lv denied 6 NY3d 713 [2006]).  Thus, in order for Cadwalader to prevail on its summary judgment motion, it must establish that it provided the advice, and conducted the due diligence expected of counsel "exercis[ing] the ordinary reasonable skill and knowledge commonly possessed by a member of the legal profession" (Dombrowski, 19 NY3d at 340).  If Cadwalader fell short of this professional standard, it must demonstrate that its conduct was not the proximate cause of Nomura's damages.

**V.**

As discussed below, we conclude that Cadwalader established that it provided the proper advice regarding REMIC qualification, and that it conducted the due diligence required in the context of its representation of Nomura.  Nomura has failed, in response, to establish the existence of a material triable issue of fact.  Therefore, the Appellate Division should have granted Cadwalader summary judgment and dismissed Nomura's legal malpractice cause of action.

A.  Failure to Advise

Nomura admits that Cadwalader advised it that the REMIC regulations required that mortgage loans be secured by real property equal to 80% of the loan.  Yet, it contends that Cadwalader failed to properly advise it on the mechanics of *how* to apply the 80% test to the D5 securitization properties.  However, Cadwalader's summary judgment submissions sufficiently belie this claim.

Cadwalader submitted deposition testimony from Charles Adelman and Anna Glick, two Cadwalader partners responsible for the D5 securitization.  They testified that they advised Nomura regarding how to satisfy the REMIC 80% test, and what constituted real property for REMIC purposes.

Adelman testified that in the years before and during the D5 securitization, Cadwalader advised Nomura "as to each and every one of the matters described in" Cadwalader's advice sheet, which was included in Cadwalader's summary judgment papers.  The advice sheet specifically sets forth 12 bullet points concerning advice on REMIC qualification and Nomura's representations and warranties.  Listed therein are the following advisements: "Personal property does not count towards the REMIC test--only real property counts"; "real property includes land and improvements and other permanent structures"; the REMIC test is "best proved by an independent third-party appraisal and should measure real property separately"; "it was Nomura's

responsibility to confirm the accuracy of Nomura's representations and warranties in the MLPSA, including the 80% warranty"; "Cadwalader would not independently verify the accuracy of any of Nomura's representations and warranties unless asked to do so by Nomura"; and the LTV ratios are "guidance on whether a loan is REMIC eligible, but [are] not a substitute for due diligence required to ensure that a loan is secured by real property equal to 80% of the loan."

Glick testified that Cadwalader repeatedly advised Nomura about how to comply with the 80% test. She stated that "[o]ver the course of the ten years or so that I did work for Nomura, we had numerous discussions about REMIC requirements, the 80 percent requirement, about what satisfied the 80% requirement." She noted that in working with Nomura "new questions would come up, and so we would be advising [Nomura] continuously over this entire ten-year period, we w[ould] be discussing REMIC related and 80 percent issues, as well as what type of collateral would satisfy the 80 percent."

Cadwalader also submitted Glick's affidavit, wherein she states that Cadwalader told Nomura prior to the D5 securitization closing that land and structural improvement should be added to determine REMIC real property:

> "As part of that advice, a rule of thumb communicated by Cadwalader to Nomura was that the value of what was plainly real property (such as land and structural improvements, or 'sticks and bricks'), should be added up by Nomura to see if it amounted to at least 80%

> of the loan amount. If those items alone
> satisfied the 80% Test (and they usually
> did), then the 80% Test would be satisfied.
> If not, then Nomura needed to inquire further
> to determine whether the loan met the 80%
> Test."

Cadwalader also submitted testimony from Nomura's former Vice President and officer-in-charge of the D5 securitization, Perry Gershon.  Gershon's testimony wholly confirmed Adelman and Glick's representations.  He testified that Cadwalader fully informed Nomura about the REMIC requirements and how to ensure compliance with the 80% test.  Like Adelman, he testified that Cadwalader provided all the advice listed on the Cadwalader advice sheet, and that Cadwalader advised Nomura that if it had any questions regarding whether a property contained sufficient real property in compliance with the REMIC regulations, Nomura needed to consult with outside counsel prior to making the loan.

When asked specifically about Nomura's understanding about the REMIC regulations and the 80% test, Gershon confirmed that Cadwalader advised Nomura: 1. REMIC eligibility required the mortgage loan to be principally secured by an interest in real property, meaning that at least 80% of the mortgage is secured by real property; 2. personal property does not count towards the 80% test; and 3. the 80% test is best proved by an independent third-party appraisal, which measures real property separately. According to Gershon, "Cadwalader definitely gave instructions to Nomura that . . . among the purposes of getting these properties

appraised was to show that they would, in essence, be REMIC-eligible assets." The foregoing testimony was buttressed by documents relating to the hospital mortgage loan originated by Nomura that reflected Nomura's awareness of the applicable REMIC regulations.

This evidence sufficiently established that Cadwalader adequately advised Nomura concerning REMIC qualification as applicable to the D5 securitization. The burden then shifted to Nomura to set forth evidence to establish material issues of triable fact (see Vega, 18 NY3d at 503).

In an effort to meet its burden, Nomura argued that credibility issues foreclosed summary judgment. Specifically, Nomura sought to discredit Gershon's testimony based on bias, alleging that Gershon's spouse was a Cadwalader attorney who worked on the Nomura matters, and that after Gershon left Nomura, his spouse benefitted financially from securitization business Gershon continued to send to Cadwalader. We agree with the Appellate Division that this alleged credibility issue is speculative and unsupported by any evidence, and thus cannot be the basis for denying summary judgment.

Nomura also contends that a material issue of fact exists as to whether Cadwalader's advice was adequate because testimony from several Nomura employees reveals that they did not know how to apply the REMIC 80% test. As the Appellate Division properly concluded, this amounts to a showing that some Nomura

employees did not understand REMIC principles, not that Cadwalader failed to provide appropriate legal advice, or that Cadwalader refused to answer Nomura's questions about REMIC qualification.  Thus, Nomura failed to present triable issues of fact as to whether Cadwalader provided adequate advice and "exercise[d] the reasonable skill and knowledge commonly possessed by a member of the legal profession" (Dombrowski, 19 NY3d at 350).  Therefore, Cadwalader is entitled to summary judgment with respect to Nomura's failure to advise claim.

B.  Due Diligence

Nomura's other claim in support of its legal malpractice cause of action, is that Cadwalader failed to conduct the requisite due diligence prior to issuing its pre-closing REMIC opinion letter.  According to Nomura, in order to fulfill its professional responsibilities, Cadwalader could not simply rely on Nomura's representations, but instead had to review the appraisals for all the mortgage loans in the D5 securitization to ensure that each loan was REMIC-qualified.

In support of its summary judgment motion on this claim, Cadwalader argues that Nomura did not retain it to conduct or review appraisals, generally, or in its role as securitization counsel.  Cadwalader submitted testimony from Adelman and Nomura's own representatives describing Cadwalader's role vis-a-vis the D5 securitization.  Cadwalader also submitted testimony

from experts regarding the accepted practice of attorneys dealing with REMIC qualification and securitization, which further supports the conclusion that a duty to review appraisals was beyond the scope of Cadwalader's representation.

For example, Adelman testified that it was Nomura's responsibility to review the D5 securitization appraisals. According to Adelman, Nomura told Cadwalader that it would review appraisals and that Cadwalader "was not to duplicate Nomura's work in that regard."  Adelman also stated that Nomura's "direction was specific enough that we did not view it as our normal process to have appraisals sent to us for review." (A 1942).  Instead, as the Cadwalader opinion letter made clear, Cadwalader relied on Nomura for the fact that the property was REMIC-qualified because it met the 80% test.

Gershon acknowledged that Nomura did not request or expect that Cadwalader review the appraisals for the D5 securitization.  He further acknowledged that Cadwalader advised Nomura that it relied on Nomura's representations, and that Nomura was responsible for the accuracy of those representations, as well as the warranties in the MLPSA, specifically the 80% warranty.  Most devastating was Gershon's acknowledgment that Cadwalader advised Nomura that it would not independently verify the accuracy of Nomura's representation and warranties unless asked to do so, and that Nomura did not make any such request. Gershon's understanding was confirmed by General Counsel for

Nomura Asset Capital Corporation, Barry Funt, who testified that he "would not have requested or even thought it proper for Cadwalader to review every single appraisal."

The experts confirmed that this representation was in line with legal practice in the securitization field. James Peaslee, an expert for Cadwalader, opined that it was not standard practice for securitization counsel to review appraisals, absent a specific request from the client. David Rodgers, an expert on origination and securitization, stated that, subject to a specific agreement, "the role of securitization counsel relating to the determination of REMIC value does not include calculating or even recalculating real property value-to-loan ratios for loans."

This testimony, along with Cadwalader's clear statements in its opinion letter that it relied on Nomura's representations for its conclusions that the D5 securitization was REMIC-qualified, are sufficient to establish a prima facie showing in support of Cadwalader's motion for summary judgment. The burden then shifted to Nomura.

In response, Nomura disputes that this was the parties' understanding of Cadwalader's professional obligations, and relies on alleged discrepancies in the testimony, to show otherwise. However, Nomura mischaracterizes the record, which, as we have described, makes abundantly clear that the parties understood that Nomura, pursuant to its own directives, was

responsible for: securing the appraisals; reviewing whether, based on those appraisals, the loans complied with the 80% test; and confirming the veracity and accuracy of Nomura's warranties as set forth in the MLPSA.

Nomura also relies on expert testimony from Thomas J. Biafore and Arthur N. Field, that Cadwalader could not rely on Nomura's representations to establish the properties' value because that factual determination was tantamount to the legal representation required of Cadwalader.  This testimony, however, focuses on general principles, and does not create a triable issue of fact concerning the parties' actual understanding of Cadwalader's responsibilities.  As Gershon acknowledged, Nomura understood that Cadwalader would not request the appraisals in the course of its review of the D5 securitization documents, and Cadwalader would rely on Nomura's representations that the 80% test had been met unless Nomura asked it to look further.

Essentially Nomura seeks to have us ignore the fact that it assumed the responsibility for ensuring that the loans complied with the 80% test based on independent appraisals that Cadwalader did not conduct or review.  However, we cannot ignore that Nomura chose to run its business in this way, and that Cadwalader acted upon and relied on that business model in its representation of Nomura.

Nomura argues, alternatively, that even if Cadwalader did not have a general duty to confirm Nomura's representations

for all the D5 mortgage loans, it had such a duty in the case of the hospital loan.  In support, Nomura relies on testimony from Adelman and Cadwalader's experts that Cadwalader had a legal responsibility to confirm REMIC qualification where a "red flag" suggested that the appraisal valuation of the real property was inconsistent with Nomura's representations.  Cadwalader concedes this point, but argues that there was nothing in the D5 securitization to require that it confirm Nomura's representations of REMIC qualification.

Nomura contends that the highlights document was a red flag because it contained statements that the loan was "secured by the land, building, and operations," and that the collateral for the loan is the "land, building and property management (operations)."  Nomura argues that this alerted Cadwalader to the possibility that the appraisal was based on the hospital's operations, and not land and buildings, as required for REMIC qualification.  As a consequence, Cadwalader should have taken steps to confirm that the property satisfied the 80% test.

Despite Nomura's arguments to the contrary, the fact that the operational part of the hospital business may have factored in some way into the appraisal did not mean that Cadwalader should have considered Nomura's representations unreliable.  After all, the D5 securitization consisted of numerous commercial mortgages, all of which Nomura assessed in accordance with Cadwalader's advice about how to determine REMIC

qualification based on the 80%. Therefore, the hospital mortgage loan was no different from the others.

Moreover, what Nomura now identifies as a red flag-- that a commercial property may be valued, in part, based on its business operations--had already been raised by Cadwalader with Nomura as something to monitor in the valuation process. Adelman testified that he communicated to Nomura representatives that REMIC real estate did not include what he called the "business element of the overall [property] value," explaining that where the "income was from the operation of a business rather than rent, it required a distinction between the real property value from being occupied by a going business as distinguished from the value of the business itself."

Nomura also argues that Cadwalader should not have ignored the fact that the highlights document includes a cost approach valuation of the hospital that is dangerously close to the 80% REMIC minimum. While it is true that the cost approach valued the hospital property at $40,600,000, that number is still above the $40 million required to meet REMIC qualification. In any case, and more to the point is the fact that the highlights document placed the hospital's reconciled appraised value at $68 million, $28 million in excess of the $40 million required under the 80% test. That final appraisal was established only after the reconciliation of the three valuation approaches, two of which (the "income" and "sales" approaches) valued the property

at over $60 million.  Given such a large differential, Cadwalader did not have a basis to doubt Nomura's representation that the hospital loan complied with the 80% test.  Indeed, Adelman testified that in his experience, even if a property valued at $68 million included a significant amount of personal property, its real property valuation would not fall below $40 million dollars.  Gershon similarly testified that in his experience in real estate, a $68 million appraisal based on the income approach (which was the case here) means the real estate value likely exceeded $40 million.  Rather than establish that triable issues of fact exist, the evidence instead shows that these parties-- sophisticated business entities in the securitization field--held similar views that a $68 million appraisal provided sufficient confidence that the property was REMIC-qualified.

Cadwalader, thus, met its burden to establish that it conducted the requisite due diligence, and that it "exercise[d] the ordinary and reasonable skill and knowledge commonly possessed by a member of the legal profession" when it relied on Nomura's representations in issuing an opinion that the D5 securitization was REMIC-qualified (see Dombrowski, 19 NY3d at 340).  In contrast, Nomura failed to meet its burden to establish the existence of a triable issue of fact.

## VI.

For the foregoing reasons, the Appellate Division's

order should be modified, with costs to Cadwalader, by granting Cadwalader's motion for summary judgment dismissing the first cause of action in its entirety and, as so modified, affirmed and the certified question answered in the negative.

* * * * * * * * * * * * * * * * *

Order modified, with costs to defendant, by granting defendant's motion for summary judgment dismissing the first cause of action in its entirety and, as so modified, affirmed and certified question answered in the negative. Opinion by Judge Rivera. Chief Judge Lippman and Judges Pigott, Abdus-Salaam, Stein and Fahey concur.

Decided October 22, 2015