This opinion is uncorrected and subject to revision before
publication in the New York Reports.
--------------------------------------------------------------

No. 21
Maria De Lourdes Torres,
           Appellant,
        v.
Police Officer Jones, et al.,
           Defendants,
City of New York,
           Respondent.
(And Another Action.)


           David H. Perecman, for appellant.
           Devin Slack, for respondents.
           New York State Trial Lawyers Association, amicus
curiae.


ABDUS-SALAAM, J.:

           In a false arrest action under federal and state law,

evidence that the defendant police officers arrested the

plaintiff without probable cause, after inventing a patently

false confession, may establish the officers' liability for

detaining the plaintiff without any lawful privilege.  Evidence

- 1 -

that the officers forwarded the false confession to prosecutors can satisfy the commencement element of a malicious prosecution cause of action, and the proof of the absence of probable cause for the prosecution and the police's transmission of the fabricated evidence can overcome the presumption of probable cause arising from a grand jury's indictment of the plaintiff. The same proof can support an inference that the police acted with actual malice in commencing the prosecution. Applying these principles to the consolidated appeals now before us, we hold that the courts below improperly granted summary judgment to the individual defendants on plaintiff's false arrest and malicious prosecution claims under New York common law and 42 USC § 1983. We further conclude that, although plaintiff maintains triable state law claims against defendants the City of New York and the New York City Police Department, the lower courts properly granted summary judgment to those governmental entities on plaintiff's claims under 42 USC § 1983 in accordance with Monell v New York City Dept. of Social Servs. (436 US 658 [1978]) and its progeny.

I.

A

On the night of September 24, 2002, Einstein Romeo Acuna's son found Acuna's dead body in front of the doorway to the apartment that they shared in Queens. Acuna's son called the police and reported the death. As later recounted by the

individual defendants in their depositions in the instant civil actions, defendants Detective Michael McEntee and Detective Daniel Corey responded to the scene.  There, the detectives saw Acuna's naked corpse in a pool of blood in the hallway in front of Acuna's apartment.  Evidently, Acuna had been stabbed repeatedly.[1]  The detectives went inside the apartment, in which there were no signs of forced entry.  As the detectives examined the apartment, they observed some blood stains on the walls of the interior hallway, dining area and kitchen.  However, the majority of the blood at the scene had pooled near the entrance to the apartment.  Additionally, the police found some blood in a nearby stairwell.

Detective Corey, defendant Detective Erik Hendricks and other officers canvassed the building for suspects, but found none.  Corey and Hendricks interviewed Acuna's neighbors about the crime, and some of the neighbors reported that they had heard screaming and someone falling to the floor in the hallway.[2]

_____

[1]  On the day after the crime, the Office of the Chief Medical Examiner (OCME) completed an autopsy report, in which the medical examiner determined that Acuna had over 20 stab wounds, including some that were between five and seven inches deep. With the exception of Detective Corey's deposition testimony, the record does not indicate whether or when the detectives learned of the autopsy results.  At his deposition in the eventual civil action here, Detective Corey revealed that he had become aware of the autopsy results at some unspecified point in time.

[2]  In opposition to defendants' summary judgment motion in the instant civil actions, plaintiff submitted a police report indicating that a neighbor had told the detectives that, on the night of the crime, the neighbor had heard footsteps on the roof.

Meanwhile, another detective assigned to the case, defendant Irma Santiago, contacted Acuna's sister-in-law, who stated that she had spoken to Acuna via telephone at about 7:30 p.m. on the night of his death. This information placed Acuna's time of death at approximately 8:00 p.m.

On a return trip to the apartment on or shortly after the date of the crime, Detective McEntee discovered a woman's crucifix necklace on the nightstand in Acuna's bedroom. When interviewed by the police, however, Acuna's relatives essentially stated that, to their knowledge, Acuna did not have a girlfriend. Additionally, Acuna's family and neighbors did not identify anyone who had a motive to murder Acuna.

### B

According to the police witnesses' testimony at a suppression hearing in the criminal prosecution that led to the instant lawsuit, developments following the police's initial investigation led them to contact plaintiff Maria De Lourdes Torres. Specifically, Detectives Santiago and McEntee eventually learned that Acuna's telephone records showed that, on the day of the murder, someone had called Acuna's cellular telephone from a telephone located at plaintiff's residence. The records further reflected that Acuna had repeatedly received calls from that telephone on various occasions.

On October 11, 2002, Detective McEntee went to the apartment. There, McEntee met the couple who owned the

apartment, and in response to his inquiries, they said that they did not know Acuna and had not called him. The couple further explained that, besides themselves, only plaintiff, who rented a room from them, could have accessed the telephone in the apartment. Soon thereafter, McEntee spoke to plaintiff in the presence of the apartment owners. Displaying a photograph of Acuna, McEntee asked plaintiff whether she knew the man in the photograph, and she claimed that she did not know him.

The police did not find plaintiff's denials convincing, and so on the night of October 25, 2002, Detectives Hendricks and Santiago went to plaintiff's apartment. Santiago asked plaintiff whether she knew Acuna, and plaintiff denied that she knew him. When Santiago told plaintiff that telephone records showed that someone had called Acuna from her apartment, plaintiff claimed that she had not called him. Given that this interview occurred in the presence of the owners of the apartment, Santiago became concerned that plaintiff was reluctant to give candid answers to her questions in front of them. Accordingly, Santiago asked plaintiff if she would come to the local police precinct, and plaintiff agreed to accompany Santiago there.

At the precinct, Santiago and Hendricks asked plaintiff again whether she knew Acuna and had telephoned him on the day of the murder. About 15 minutes into this conversation, Santiago showed Acuna's telephone records to plaintiff, at which point she acknowledged that she knew Acuna. Plaintiff stated that she had

previously lied about calling Acuna on the day of the crime because she had used the telephone in her apartment to make the calls, which the owners had forbidden her to do, and she did not want to admit her unauthorized use of the telephone in their presence.  After receiving this explanation, Santiago permitted plaintiff to leave.

In early November 2002, the police contacted plaintiff and asked her whether she would submit to a polygraph examination, and she replied that she would.  At about 7:00 a.m. on November 8, 2002, Detective Santiago and defendant Detective Denitor Guerra picked up plaintiff at her home and transported her to the precinct, where they arrived at about 7:30 a.m. Plaintiff waited in a room with the detectives for almost two hours, during which time the detectives did not question her. Detectives Santiago, Guerra and Hendricks then took plaintiff to the District Attorney's Office.  There, at about 9:30 a.m., plaintiff signed a consent form and agreed to take the polygraph test, and the detectives sat with her while they waited for a few hours for the polygraph device to be available and ready for use. At about 12:30 p.m., defendant Lieutenant Vilardi, the Deputy Chief Investigator at the District Attorney's Office, administered the polygraph examination, and Santiago and Vilardi asked plaintiff questions relating to Acuna's murder, repeating each question multiple times and in Spanish.  The examination lasted about 40 minutes.

After the examination, the detectives took plaintiff out for lunch.  At about 4:30 or 5:00 p.m., they brought plaintiff back to the precinct and placed her in an interview room, and Santiago and Guerra periodically stayed in the room with plaintiff.  At about 11:30 p.m., Santiago read Miranda warnings to plaintiff in Spanish, and on a form, plaintiff indicated that she understood each Miranda right.  Santiago questioned plaintiff about Acuna's murder, and Detective Corey periodically entered the room, though he did not participate in the questioning of plaintiff.  From approximately 1:00 a.m. to 1:45 a.m., plaintiff confessed to murdering Acuna in self-defense.  Plaintiff asked Santiago to write down her confession, and Santiago complied, generating a three-page written version of plaintiff's statement in Spanish.  Plaintiff signed the statement.

Next, the detectives requested permission to search plaintiff's room, and plaintiff signed a consent form authorizing the search.  Later that morning, Detective Corey searched the room.  Corey recovered the clothes that, according to plaintiff's statement, she had worn during the murder.  Corey also found a knife in the room.  The police arrested Torres for Acuna's murder.

C

The District Attorney's Office convened a grand jury in this case, and in January 2003, the grand jury returned an

indictment charging plaintiff with two counts of murder in the second degree (see Penal Law §§ 125.25 [1]; 125.25 [2]) and one count of criminal possession of a weapon in the fourth degree (see Penal Law § 265.01 [2]).  Subsequently, plaintiff filed an omnibus motion for, among other things, dismissal of the indictment and suppression of her statement to the police and of the evidence recovered from her room.

In February 2003, while plaintiff's omnibus motion was pending, OCME completed preliminary forensic testing on the blood found in Acuna's apartment.  The test results indicated that the blood belonged to Acuna and two unknown males.  At that time, OCME had not compared plaintiff's DNA to the DNA present in the blood in Acuna's apartment.  The record does not reveal whether the investigating detectives learned of the preliminary DNA test results during the criminal proceedings against plaintiff.

At a Huntley/Mapp hearing following an in camera inspection of the grand jury minutes, in summer 2003 prosecutors presented the testimony of Detectives Santiago, Corey and McEntee, as well as the testimony of Lieutenant Vilardi.  Those witnesses described their interactions with plaintiff on October 11, October 25, November 8 and November 9, 2002, in essentially the manner set forth above.  At the close of the hearing, Supreme Court denied plaintiff's suppression motion.

Meanwhile, in January 2004, OCME completed its comparison of plaintiff's DNA to the DNA in the blood samples

taken from Acuna's apartment, and the results showed that plaintiff's DNA was not present in the blood samples.  The record does not indicate whether the detectives learned about these test results during the criminal proceedings against plaintiff.

After Supreme Court denied plaintiff's suppression motion, plaintiff moved to reopen the suppression hearing and call Detectives Guerra and Hendricks to testify at the reopened hearing.  Supreme Court granted plaintiff's application to reopen the suppression hearing, and at the reopened hearing, Detectives Guerra and Hendricks testified to their roles in the investigation as recounted above.  Crediting their testimony, Supreme Court again denied plaintiff's suppression motion.

In January 2007, the District Attorney's Office moved to dismiss the charges against plaintiff, and the court granted the motion.

D

In September 2007, plaintiff commenced the first of the instant civil rights actions by filing a complaint in Supreme Court against the City of New York (the City) and several police officers involved in the investigation of Acuna's murder, including Lieutenant Vilardi and Detectives Santiago, Guerra, Hendricks, Corey and McEntee.  In the complaint, plaintiff asserted a cause of action against the City and the individual defendants for violation of 42 USC § 1983, a cause of action against the City for negligent supervision and a cause of action

against the individual defendants for wanton, wilful and reckless conduct.  Plaintiff maintained, inter alia, that the City had negligently failed to supervise the officers who wrongfully suspected her of killing Acuna and had negligently furthered her wrongful arrest and prosecution.  Only the City answered in the first action.  Plaintiff did not serve any of the other defendants and unsuccessfully sought an extension of time in which to do so.

Thereafter, plaintiff commenced the second lawsuit by filing a complaint against the New York City Police Department (NYPD), Lieutenant Vilardi and Detectives Santiago, Guerra, Hendricks and Corey.  In that complaint, plaintiff asserted causes of action for: defendants' denial of plaintiff's constitutional rights to due process and equal protection in violation of 42 USC § 1981; the individual defendants' unlawful detention of her in violation of 42 USC § 1983; the NYPD's pattern and practice of improper treatment of arrestees in violation of 42 USC § 1983; the NYPD's failure to supervise the individual defendants who improperly arrested plaintiff in violation of 42 USC § 1983; defendants' unlawful malicious prosecution of plaintiff under the common law; defendants' unlawful false arrest and imprisonment of plaintiff under the common law; and defendants' improper conduct warranting punitive damages.  Plaintiff successfully served the City and Detectives Santiago, Guerra and Hendricks with the summons and complaint in

the second action; consequently, the City's attorney appeared and answered on behalf of the NYPD and those detectives in that action.

E

Detectives McEntee, Santiago, Corey and Hendricks were deposed in these actions.[3]

At their depositions, the detectives gave an account of the disputed events that was mostly consistent with the prosecution witnesses' testimony at the suppression hearing. However, while the detectives' suppression hearing testimony covered primarily their interactions with plaintiff, their deposition testimony recounted their investigation at the crime scene and the other developments in the investigation summarized above. And, the detectives provided new details about their discussions with plaintiff on November 8 and November 9, 2002.

According to their deposition testimony, just prior to the polygraph examination on November 8, 2002, Detective McEntee showed plaintiff a crime scene photograph of Acuna and asked her to confirm that she knew Acuna. Upon seeing the picture, plaintiff cried out, but she immediately returned to a state of calm in a manner that struck McEntee as "[c]old blooded."

---

[3] Immediately prior to the start of Corey's deposition, counsel for the City acknowledged on the record that he represented Corey and appeared on Corey's behalf "without any jurisdictional defenses or anything like that or statute of limitations."

Following the polygraph examination, Lieutenant Vilardi informed Santiago that the results were "[i]nconsistent, that it was like she was lying."  Vilardi told Detective Corey, however, that the results were "inconclusive."

After the polygraph examination and a lunch break, at about 11:30 p.m., the detectives interrogated plaintiff as described at the suppression hearing.  At some point during the interrogation, the interviewing detectives told Detective Corey that defendant was crying and claiming that she had accidentally killed Acuna.  At around that time, plaintiff orally confessed to her interrogators that she had killed Acuna in self-defense, and Santiago wrote versions of that statement in English and Spanish.  According to her paperwork, Santiago finished writing the statement at about 4:45 a.m., not at 1:45 a.m. as she had suggested in her hearing testimony.

The English-language version of the statement declared that plaintiff had met Acuna two years before the murder.  According to the statement, they started a friendship that later became a sexual relationship.  One day during the week prior to the date of the murder, plaintiff was having sex with Acuna, and he demanded that she remove her crucifix necklace while they were engaging in this intimate activity.  She complied and left the necklace in his bedroom.  Later that week, plaintiff called Acuna to ask him to return the necklace, and although they made various plans for its return later that week, those plans fell through.

Regarding the day of the murder, plaintiff's written

statement said:

> "The following day, Tuesday, I called him
> again it was around 12:30 or 1:00 in the
> afternoon and he asked me if I liked the way
> he made love to me.  We talked a little bit,
> and he told me it was okay to visit him
> because his son was working and he was going
> to be home alone.  I bath[ed], dressed and
> fixed myself up so I could go and visit him.
> When I arrived at his house he asked me why
> it took so long.  Immediately I went to his
> bedroom, and he removed my clothing and I
> didn't resist.  He made love to me. . . . I
> was laying on his bed and <u>he immediately
> asked me to pass him a condom</u>, and he
> commence[d] to remove his shorts. . . . After
> we had sex, he grabbed my clothes and threw
> them at me, and he stated, 'Get dress[ed]',
> and [he] told me I had to leave." (emphasis
> added).

Following this explanation of the origin of the

confrontation between plaintiff and Acuna, the statement

continued:

> "I didn't want to leave, but he insisted that
> I leave, and he continued pulling me and I
> resisted.  He pulled me all the way from the
> bedroom to the front door.  I tried to resist
> him, but he grabbed me by my hair and
> clothing and pushed me out.  I pushed the
> door again and reentered. . . . I asked him
> what's happening, and he said there were
> people coming to paint and he didn't want
> them to see me there. . . . I asked him are
> they going to be males or females, why is
> there so much rush for me to leave.  He
> smirked like he was making fun of me, and he
> repeated again 'leave now'.  He then began
> pulling me harder and he slapped me and began
> grabbing me by my clothing and pulled me to
> the area by the dining area.  He was grabbing
> me very hard by the hair, and grabbed it and
> <u>slammed my head against the wall</u>, and
> continued slapping me on the face.  I wasn't

defending myself, but he kept hitting me and I defended myself. . . . He dragged me to the kitchen and at this point I was looking to defend myself.  I had to defend my life, he was hitting very hard.  I was losing my mind and saw everything dark. . . At this moment I couldn't see anything.  I don't know where I grabbed the knife from, I only knew that I had to defend myself.  I had the knife in my hand, I thought he would get scared, but he didn't.  He continued to grab my hair, pulling my head forward.  I went forward towards him, and I had the knife in my hand and I stabbed him I don't know how many times.  Possibly more than two times.  I at this moment, I lose sense of time.  I saw blood coming from his chest.  I was seeing everything dark and my head was dizzy.  I didn't see if he fell to the floor.  I ran towards the front door and left.  <u>I got on the elevator</u>, and the elevator stopped on the third floor.  <u>A white female got onto the elevator, and I had my hair loose and I tried to hide my face with my hair</u>.  I don't know what I did with the knife, I can't remember where I got rid of it.  At no moment did I want to do him any harm or hurt him, but he hurt me so hard that I had to defend myself."
(emphases added).

After making this statement, plaintiff consented to a search of her room.  The detectives arrested plaintiff.

The police found a knife and some clothes in plaintiff's room, but there was no blood on those items or anywhere in her residence.  At some point after plaintiff's statement and arrest, because plaintiff had claimed in her oral statement that she believed some sheet rock had been broken when Acuna slammed her head into the kitchen wall of his apartment, a detective went back to the apartment to check the kitchen wall

for signs of damage.  The detective found no dents in the wall and reported as much to Detective Corey.  The police also asked some of Acuna's neighbors whether they had seen plaintiff in the elevator on the night of the crime, and none of them had.

"Years later," the District Attorney's Office told Corey that the DNA of one male other than Acuna had been found in the blood samples recovered from the scene of the crime. Otherwise, Corey never saw any lab reports or DNA test results. At their depositions, Detectives McEntee and Corey were questioned about whether NYPD supervisors encouraged swift arrests in homicide cases.  McEntee testified that the NYPD considered the number of cases closed by arrest as one factor among many in a detective's performance evaluation.  Corey testified that his superiors did not pressure him in any way to resolve the investigation of Acuna's murder.

<u>F</u>

At her deposition, plaintiff described her own background, explaining that she was an undocumented Mexican immigrant who sold flowers on Roosevelt Avenue in Queens, that she spoke some English but was far more fluent in Spanish and that she had only an elementary school education.  About a year before Acuna's death, plaintiff met him while she was selling flowers, and she started a friendship with him which, after a couple of weeks, became a sexual relationship.

According to plaintiff, when the detectives interviewed

her on October 11, 2002, she told Detective McEntee that she did not know Acuna.  Plaintiff hid her relationship with Acuna because she was afraid to reveal that, in the course of that relationship, she had called him from her apartment in violation of her landlords' directive not to use the telephone there. Additionally, plaintiff had difficulty recognizing Acuna in the photograph displayed by McEntee because Acuna did not have a beard in that photograph, as he did for the entire period in which they had known each other.

On October 25, 2002, plaintiff initially concealed from Detectives Santiago and Hendricks her familiarity with Acuna and her phone calls to him, but she did so only because she spoke to those detectives in the presence of the couple from whom she rented a room and did not want to divulge her unauthorized use of their telephone.  Following that initial conversation, plaintiff willingly accompanied the detectives to the precinct, and she acknowledged her connection to Acuna.  After her arrival at the precinct, the detectives took plaintiff to an interview room, and they placed Acuna's bloody clothes and photographs of the grisly scene of his murder on a table in the room.  The detectives asked plaintiff whether she was afraid, and she answered that she was scared because she had "never seen anything like that."  The detectives asserted that plaintiff was scared because she had committed the murder, but she denied this.  The detectives told her that her "conscience wo[uld]n't leave [her] alone

afterwards," and they left her alone in the interview room with the clothes and crime scene photographs, causing her to cringe in the corner of the room for the next hour.  The detectives then returned to the room and told plaintiff that she could leave, but that she should not depart the country because they would contact her again.  Plaintiff left the precinct.

On November 8, 2002, plaintiff agreed to take a polygraph examination, and Detectives Santiago, Guerra and Hendricks drove her to the precinct. There, the detectives interrogated her for three to five hours, again displaying the bloody clothes and the photographs.  Santiago told her that she "had to" claim that she had killed Acuna in self-defense. Santiago directed plaintiff to claim that Acuna had grabbed her by the hair and thrown her against the wall.  Santiago also accused plaintiff of killing Acuna out of jealousy, saying that "if [she] had done it to accept it" so that Santiago would help her.  Santiago reiterated that Santiago would tell plaintiff what to say so that Santiago could help her, but plaintiff continued to deny that she had killed Acuna.  The detectives left plaintiff alone in the room, and she started to cry.

Later that day, Santiago returned to the interview room and started writing something on a piece of paper.  Santiago told plaintiff to write that she had committed the crime, but plaintiff refused and insisted on her innocence.  Santiago next told plaintiff to "say that it was in self-defense."  Santiago

presented plaintiff with a written statement to this effect, but plaintiff refused to sign it.  Santiago asserted that signing the statement was "for [plaintiff's] good" and that Santiago "would let [her] go" if she signed it.  Subsequently, raising her voice, Santiago told plaintiff that it was her fault that Santiago "didn't go sleep with her son," adding that Santiago would soon make "a definite decision."

At that point, another detective entered the room. This detective offered plaintiff food and soothingly informed her that if she signed the statement, that would help her.  The detective pointed out that the statement would indicate that she had acted "in self-defense and that is what many women did."  The detectives repeated that plaintiff could leave if she signed the statement, and she finally signed it in the early hours of November 9 because Detective Santiago "made [her] sign that paper."  At some point, Santiago sought to videotape her interview with plaintiff, but plaintiff refused to be taped.

After plaintiff signed the confession drafted by Detective Santiago, the detectives placed her in a holding cell. Santiago offered plaintiff her business card and said that plaintiff should call her if plaintiff wanted the advice of a mother.  Thereafter, the police took plaintiff to the jail at Riker's Island, where she remained for the duration of the criminal proceedings against her.

G

After discovery, defendants moved for summary judgment dismissing the complaints in both actions. In support of the motion, defendants asserted, inter alia, that the detectives' deposition testimony and other evidence established that they had lawfully arrested plaintiff based on her suspicious conduct, including her voluntary confession that she had murdered Acuna. Defendants also argued that they had demonstrated their entitlement to judgment as a matter of law on the probable cause and malice elements of plaintiff's false arrest and mprosecution claims. And, defendants maintained that plaintiff had neither pleaded nor proven that the City had a custom or practice of committing constitutional violations that could render it liable under 42 USC § 1983. Additionally, defendants argued that plaintiff had abandoned her claims against the individual defendants on whose behalf the City had not interposed an answer because she had failed to seek entry of a default judgment against them within one year.

Plaintiff opposed defendants' motion, asserting that the detectives' testimony did not conclusively establish that they had probable cause to arrest her and that her testimony created a triable issue of fact as to whether they had improperly relied on her false confession to justify the arrest. In opposition to the City's claim that no City policy or practice had caused any violation of plaintiff's constitutional rights, plaintiff submitted an affidavit from an expert witness, Evrard

Williams, a former NYPD homicide detective who last served in 1985. Williams opined that the detectives had coerced plaintiff into confessing by promising that they would release her for doing so, and he maintained that the detectives must have taken such action "because of a strong policy that was pervasive throughout the police department to quickly investigate and close out investigations so that statistically it would appear that the police department was quickly solving crimes, particularly homicides." In support of plaintiff's claim that the City and the NYPD had a policy of pressuring police officers to make arrests without probable cause, she also cited Detective McEntee's testimony that police officials evaluated each detective's performance based in part on the number of cases the detective has closed via arrest.

In a short form order filed in the first action on August 10, 2012, Supreme Court dismissed plaintiff's claims against all of the individual defendants as abandoned, and it dismissed the complaint against the City on the merits. Plaintiff appealed the August 10 order to the Appellate Division. Evidently, judgment was never entered in the first action.

In a short form order filed in the second action on August 9, 2012, Supreme Court dismissed plaintiff's claims against Lieutenant Vilardi and Detective Corey as abandoned, and it dismissed her claims for malicious prosecution, false arrest, violations of 42 USC § 1981 and violations of 42 USC § 1983 on

the merits.  On November 30, 2012, Supreme Court, relying on the August 9 order, entered judgment dismissing the complaint against defendants in the second action.  Plaintiff appealed from both the August 9 order and the November 30 judgment.  The Appellate Division consolidated plaintiff's appeals in both actions.

The Appellate Division unanimously affirmed the August 10 order and the November 30 judgment dismissing the complaints in both actions, and it dismissed the appeal from the August 9 order in the second action on the ground that the issues raised in that appeal had been brought up for review and considered on the appeal from the November 30 judgment (see Torres v Jones, 120 AD3d 572, 572-575 [2d Dept 2014]).  On the merits, the Appellate Division held that defendants had made a prima facie showing of entitlement to summary judgment on all of plaintiff's claims, and it ruled that plaintiff had failed to rebut defendants' showing with proof sufficient to demonstrate the existence of any triable issue of fact (see id. at 574-575).  We granted plaintiff leave to appeal, and we now modify the Appellate Division's order.

II.

A

Under the common law, a plaintiff may bring suit for false arrest and imprisonment against one who has unlawfully robbed the plaintiff of his or her "freedom from restraint of movement" (Broughton v State of New York, 37 NY2d 451, 456 [1975], cert denied sub nom Schanbarger v Kellogg, 423 US 929

[1975]; see Dobbs' Law of Torts § 41 [2d ed. 2011]).  To prevail on such a cause of action, the plaintiff must demonstrate that the defendant intended to confine the plaintiff, that the plaintiff was conscious of the confinement, that the plaintiff did not consent to the confinement and that the confinement was not privileged (see Donald v State of New York, 17 NY3d 389, 394-395 [2011]; Martinez v City of Schenectady, 97 NY2d 78, 85 [2001]; Parvi v City of Kingston, 41 NY2d 553, 556 [1977]).  For purposes of the privilege element of a false arrest and imprisonment claim, an act of confinement is privileged if it stems from a lawful arrest supported by probable cause (see Gisondi v Town of Harrison, 72 NY2d 280, 283 [1988]; Broughton, 37 NY2d at 458; see also Fortunato v City of New York, 63 AD3d 880, 880 [2d Dept 2009]).  "Probable cause consists of such facts and circumstances as would lead a reasonably prudent person in like circumstances to believe plaintiff guilty" (Colon v City of New York, 60 NY2d 78, 82 [1983]).  "Probable cause does not require proof sufficient to warrant a conviction beyond a reasonable doubt but merely information sufficient to support a reasonable belief that an offense has been or is being committed" by the suspected individual, and probable cause must be judged under the totality of the circumstances (People v Bigelow, 66 NY2d 417, 423 [1985]).

The common law also recognizes a cause of action for the separate tort of malicious prosecution, which protects the

plaintiff's distinct "interest of freedom from unjustifiable litigation" (Broughton, 37 NY2d at 457).  "The elements of the tort of malicious prosecution are: (1) the commencement or continuation of a criminal proceeding by the defendant against the plaintiff, (2) the termination of the proceeding in favor of the accused, (3) the absence of probable cause for the criminal proceeding and (4) actual malice" (id. at 457; see Smith-Hunter v Harvey, 95 NY2d 191, 195 [2000]; Martinez, 97 NY2d at 84; Thaule v Krekeler, 81 NY 428, 433 [1880]).  Thus, while false arrest and malicious prosecution are "kindred actions" insofar as they often aim to provide recompense for illegal law enforcement activities, each action "protects a different personal interest and is composed of different elements" (Broughton, 37 NY2d at 456; see Marks v Townsend, 97 NY 590, 597-598 [1885]).  And, the unique elements of malicious prosecution typically present a greater obstacle to recovery than the elements of false arrest; as we have said, "The law [ ] places a heavy burden on malicious prosecution plaintiffs" (Smith-Hunter, 95 NY2d at 195; see Munoz v City of New York, 18 NY2d 6, 9 [1966]).

We have "never elaborated on how a plaintiff in a malicious prosecution case demonstrates that the defendant commenced or continued the underlying criminal proceeding" (Grucci v Grucci, 20 NY3d 893, 896 n [2012]).  But, by suggesting that a defendant other than a public prosecutor may be liable for supplying false information to the prosecutor in substantial

furtherance of a criminal action against the plaintiff, we have implicitly recognized that such conduct may, depending on the circumstances, constitute the commencement or continuation of the prosecution (see Colon, 60 NY2d at 82 [noting that proof establishing "that the police witnesses" have falsified evidence may create liability for malicious prosecution]; see also Hopkinson v Lehigh V. R. Co., 249 NY 296, 300-301 [1928] [noting that the falsification of evidence and presentation of that evidence to the prosecutor can constitute commencement of a prosecution]).  Relevant Appellate Division decisions are to the same effect (see Ramos v City of New York, 285 AD2d 284, 298-299 [1st Dept 2001]; cf. Defilippo v County of Nassau, 183 AD2d 695, 696 [2d Dept 1992]).  Similarly, in other jurisdictions, the rule is that the defendant commences the prosecution of the plaintiff if the defendant demands in bad faith that the public prosecutor initiate the criminal action or supplies the prosecutor with falsified evidence that the defendant knows or should know will cause the prosecutor to prosecute the plaintiff (see Zenik v O'Brien, 137 Conn 592, 596 [Conn 1951]; Szczesniak v CJC Auto Parts, Inc., 21 NE3d 486, 491 [Ill App Ct 2014]; Macintosh v Interface Group Massachusetts-Comm, 9 Mass L Rep 408 [Mass Sup Ct 1999]; Lester v Buchanen, 112 Nev 1426, 1429 [Nev 1996]; Bradley v Gen. Accident Ins. Co., 2001 PA Super 172 at 8 [Pa Super Ct 2001]).

Just as in the false arrest context, the plaintiff in a

malicious prosecution action must also establish at trial the absence of probable cause to believe that he or she committed the charged crimes, but this element operates differently in the malicious prosecution context because "[o]nce a suspect has been indicted, [ ] the law holds that the Grand Jury action creates a presumption of probable cause" (Colon, 60 NY2d at 78; see Grucci, 20 NY3d at 898; Lee v City of Mt. Vernon, 49 NY2d 1041, 1043 [1980]). Generally, the plaintiff cannot rebut the presumption of probable cause with evidence merely indicating that the authorities acquired information that, depending on the inferences one might choose to draw, might have fallen somewhat shy of establishing probable cause (see Colon, 60 NY2d at 83). And, even if the plaintiff shows a sufficiently serious lack of cause for the prosecution and rebuts the presumption at trial, he or she still must prove to the satisfaction of the jury that the defendant acted with malice, i.e., that the defendant "must have commenced the prior criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served" (Nardelli v Stamberg, 44 NY2d 500, 503 [1978]).

Although burdensome, these barriers to a malicious prosecution plaintiff's recovery are not insurmountable, and in some instances, the plaintiff can simultaneously rebut the presumption of probable cause and satisfy the malice element by demonstrating that the evidence of guilt relied upon by the defendant was so scant that the prosecution was entirely baseless

and maliciously instituted.  In that sense, "[w]hile lack of probable cause to institute a criminal proceeding and proof of actual malice are independent and indispensable elements of a malicious prosecution action, the absence of probable cause does bear on the malice issue," and "probable cause to initiate a criminal proceeding may be so totally lacking as to reasonably permit an inference that the proceeding was maliciously instituted" (Martin v Albany, 42 NY2d 13, 17 [1977]; see Thaule, 81 NY at 434).  Moreover, in the alternative, the plaintiff may show malice and overcome the presumption of probable cause with proof that the defendant falsified evidence in bad faith and that, without the falsified evidence, the authorities' suspicion of the plaintiff would not have fully ripened into probable cause (see Hopkinson, 249 NY at 300; cf. Gisondi, 72 NY2d at 284-285).  Thus, we have observed that, in the context of a malicious prosecution suit against the police, the presumption may be overcome "by evidence establishing that the police witnesses have not made a complete and full statement of facts . . . to the District Attorney, that they have misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith" (Colon, 60 NY2d at 82-83).

The foregoing elements and considerations also impact a plaintiff's parallel claims under 42 USC § 1983, which authorizes the plaintiff to sue government agents for unlawful arrest and malicious prosecution in violation of the laws and constitution

of the United States (see 42 USC § 1983; Albright v Oliver, 510 US 266, 270-275 [1994] [opinion of Rehnquist, C.J.]; Lennon v Miller, 66 F3d 416, 423-425 [2d Cir 1995]; cf. Rehberg v Paulk, __US__, 132 S Ct 1497, 1507-1508 [2012]).  Indeed, the elements of those causes of action under the federal statute are substantially the same as the elements of the comparable state common-law claims, and they are evaluated in much the same way (see Simpson v City of New York, 793 F3d 259, 265 [2d Cir 2015]; Weyant v Okst, 101 F3d 845, 852 [2d Cir 1996]; Manganiello v City of New York, 612 F3d 149, 160-161 [2d Cir 2010]; see also Paulos v City of New York, 122 AD3d 815, 817 [2d Dept 2014]).  However, as will be discussed in detail hereinafter, the government itself cannot be liable for false arrest or malicious prosecution under 42 USC § 1983 unless an official government policy, custom or widespread practice caused the violation of the plaintiff's constitutional rights (Monell, 436 US at 694, 701; City of Canton v Harris, 489 US 378, 385 [1989]).

Considering the aforementioned law in the context of a summary judgment motion, the defendant moving for summary judgment must establish a defense to the plaintiff's malicious prosecution and false arrest claims as a matter of law by submitting sufficient evidence to eliminate any material issues of fact (see CPLR 3212 [b]; Nomura Asset Capital Corp. v Cadwalader, Wickersham & Taft LLP, 26 NY3d 40, 49 [2015]; Jacobsen v New York City Health & Hosps. Corp., 22 NY3d 824, 833

[2014]; see also MacDonald v Town of Greenburgh, 112 AD3d 586, 586-587 [2d Dept 2013]).  On such a motion, the facts must be viewed in the light most favorable to the plaintiff, and every available inference must be drawn in the plaintiff's favor (see Jacobsen, 22 NY3d at 833; William J. Jenack Estate Appraisers & Auctioneers, Inc. v Rabizadeh, 22 NY3d 470, 475 [2013]).  "Once [the movant's prima facie] showing has been made, however, the burden shifts to the party opposing the motion for summary judgment to produce evidentiary proof in admissible form sufficient to establish the existence of material issues of fact which require a trial of the action" (Alvarez v Prospect Hosp., 68 NY2d 320, 324 [1986]; see Vega v Restani Construction Corp., 18 NY3d 499, 503 [2012]).  Under this summary judgment standard, even if the jury at a trial could, or likely would, decline to draw inferences favorable to the plaintiff on issues of probable cause and malice, the court on a summary judgment motion must indulge all available inferences of the absence of probable cause and the existence of malice.

                                B

        The law outlined above reveals that the lower courts here improperly granted summary judgment to defendants on plaintiff's common-law false arrest and malicious prosecution claims, and it forecloses judgment as a matter of law in favor of the individual defendants on plaintiff's claims under 42 USC §

1983.[4]  When viewed in combination with other evidence and in the
light most favorable to her, plaintiff's deposition testimony
raised triable questions of fact regarding whether the detectives
unlawfully arrested her for Acuna's murder without probable
cause, improperly commenced the prosecution against her and
participated in the prosecution out of malice.

With respect to plaintiff's false arrest claims, the
evidence of the information known to the detectives prior to her
arrest, excluding her alleged confession on November 9, 2002, did
not conclusively demonstrate that the detectives had probable
cause to arrest her as a matter of law.  To be sure, based on the
detectives' discovery of plaintiff's necklace in Acuna's bedroom,
her phone calls to him, and her admission on October 25, 2002,
that she knew him, the detectives had ample reason to believe
that she and Acuna were acquaintances or friends.  Additionally,
since Acuna's corpse was unclothed, the detectives may have had
some reason to believe that he had died shortly after having sex
with or undressing in the presence of such an acquaintance, as
opposed to a stranger.  Plaintiff also initially lied to the

---

[4]  In this context, the individual defendants are Detectives
Corey, Guerra, Hendricks and Santiago, as the instant lawsuits
were dismissed against the remaining named individual defendants
on procedural grounds.  Additionally, while the nisi prius court
removed Corey from the case based on plaintiff's failure to enter
a default judgment against him, the court's decision in that
respect was erroneous for reasons that will be discussed later in
this opinion.  Thus, plaintiff's claims against the detectives
remain viable only against Corey, Guerra, Hendricks and Santiago.

detectives by claiming that she had neither known nor called Acuna, which naturally engendered some suspicion that she was covering up her relationship with him because she felt it might make her an object of suspicion. But, while the detectives might have had reasonable cause to believe that plaintiff had an amicable relationship with Acuna and that he might have died under intimate conditions, those circumstances did not give them a reasonable belief that she, as opposed to some other friend or acquaintance of Acuna, was his sexual partner and had killed him (see generally People v Anderson, 46 AD2d 150, 151-153 [4th Dept 1974] [police illegally arrested defendant simply because he was a member of a group of the victim's friends and acquaintances]).[5]

The proof of Lieutenant Vilardi's assessment of plaintiff's performance during the polygraph examination, as formed at the time of plaintiff's interrogation and conveyed to Detective Santiago, did not eliminate any possible factual dispute regarding whether the test results raised the detectives'

---

[5] Based on plaintiff's counsel's questioning of Detective Santiago at her deposition, it appears that Santiago testified before the grand jury that, on October 25, 2002, plaintiff had admitted to her that plaintiff and Acuna had a sexual relationship. However, at the deposition, Santiago's recollection of that grand jury testimony was not refreshed. Furthermore, defendants did not cite this portion of Santiago's grand jury testimony, or even the excerpt of the deposition in which she was asked about it, in support of their summary judgment motion, nor did they argue that Santiago had been aware of plaintiff's sexual relationship with Acuna prior to her confession. As a result, defendants' current argument to that effect is unpreserved (see generally Toure v Avis Rent a Car Sys., 98 NY2d 345, 351 n3 [2002]).

suspicion to the level of probable cause.  As far as the record

shows, Vilardi merely told Detective Santiago that plaintiff had

lied about unspecified matters, and he told Detective Corey that

the polygraph test results were "inconclusive."  Therefore, when

viewed in the light most favorable to plaintiff, the evidence of

the preliminary results of the polygraph examination at most

exhibited plaintiff's willingness to lie to the police in general

and not her concealment of her commission of the murder (cf.

Livers v Schenck, 700 F3d 340, 358 [8th Cir 2012] ["a reasonable

officer who knew of the polygraph examination's flaws would not

reasonably have believed he had probable cause to arrest" the

suspect]).[6]

Crediting plaintiff's testimony for purposes of summary

judgment, a triable issue of fact exists as to whether the

confession increased the detectives' suspicion to the level of

probable cause, for by her account, they invented a false

confession and forced her to sign it.  In that regard, plaintiff

testified that, on November 8 and into November 9, Detectives

Guerra and Santiago wore down her resistance to their demands

that she confess to the murder over an extended period of time.

In fact, if a jury were to credit all of plaintiff's testimony

---

[6] In this respect, Lieutenant Vilardi's more specific report about the polygraph results, which was drafted days after plaintiff's arrest and cited by defendants in their summary judgment motion, does not eliminate all triable issues of fact regarding the conclusions reached by Vilardi and the detectives at the time of the arrest, rather than thereafter.

and part of the detectives' testimony, the jurors could find that the detectives questioned her for around 21 hours and that, during at least 11 of those hours, plaintiff did not feel free to leave. Throughout that period, Santiago told plaintiff that she "had to" confess to killing Acuna, positing alternative theories of plaintiff's motive by suggesting that she had killed him in self-defense or out of jealousy. From the early stages of the interview, Santiago insinuated details of the crime that ended up in the confession, including the written confession's allegation that plaintiff had stabbed Acuna after he slammed her head into a wall. As Santiago continued to insist that plaintiff admit her guilt throughout the interview at the police precinct, Santiago also declared that Santiago would tell plaintiff what she should say so that Santiago could help her. Implicitly threatening to make an imminent "definite decision" to arrest her, Santiago made plaintiff fear that she would soon be imprisoned if she did not confess.

In the later stages of the interrogation, Santiago alone wrote out the confession, without plaintiff's input, and then urged plaintiff to sign it, saying it was for her own good. Eventually, Santiago and Guerra took turns requesting and demanding that plaintiff sign the statement. Finally, after the detectives repeatedly promised plaintiff that they would let her

go if she signed the statement, she relented and signed it.[7]

Clearly, this account of the detectives' interview with

plaintiff, which must be credited on a summary judgment motion,

established that plaintiff's confession was false, for Detective

Santiago allegedly invented the entire contents of the confession

herself, drafted the confession and then used a combination of

deceptive assurances and implicit threats to pressure plaintiff

into signing the statement.[8]

Beyond the tactics described by plaintiff, the

detectives' own familiarity with the evidence in the case should

have given them pause about the reliability of the statement they

purportedly drafted for plaintiff to sign.  The confession

---

[7]  Whether certain interrogation practices are legally permissible is to be decided on a case-by-case basis.  All we decide here is that plaintiff's account of the impact of the detectives' interrogation techniques on her decision to sign the confession contributed to triable issues of fact in connection with her false arrest and malicious prosecution claims.

[8]  In relying on plaintiff's testimony that she signed the confession only in response to the detectives' lengthy interrogation of her and their commanding and cajoling her to confess, we do not decide on summary judgment that the evidence is legally insufficient to support a fact finder's conclusion that the police had probable cause to arrest plaintiff based upon the confession, nor do we opine that the confession was involuntarily made as a matter of law.  Indeed, as we explain later in this opinion, plaintiff, like defendants, has not established entitlement to judgment as a matter of law.  At bottom, our decision here is grounded on the long-established principle that "where it is demonstrated that there is a dispute about . . . the inferences to be drawn by a reasonable person from the facts which led to the [arrest or] prosecution, the uniform rule has been to require there be a factual resolution at a trial" (Munoz, 18 NY2d at 11).

claimed that plaintiff had sex with Acuna using a condom, that she had stabbed Acuna in the kitchen and that she had run out of the apartment to the elevator. But the detectives never found a condom or wrapper in the apartment, there was not much blood in the kitchen and the blood trail from the apartment suggested that the killer had fled down the stairs rather than into the elevator. Accordingly, when viewed in the light most favorable to plaintiff, the inconsistencies between the crime scene evidence and the confession, as well as plaintiff's account of the detectives' invention of the confession, revealed that the detectives knew that the confession was false and that therefore it could not have reasonably contributed to their suspicion of plaintiff at all. Thus, the evidence gave rise to a triable issue of fact as to whether the detectives falsified plaintiff's confession and brazenly arrested her without even arguable probable cause, and defendants were not entitled to summary judgment on her false arrest claim (cf. Warney v State of New York, 16 NY3d 428, 435-436 [2011] [where plaintiff alleged in a suit under the Court of Claims Act that the police used threats and coercive tactics to prompt him to falsely confess to a crime and include a few true details in the confession, dismissal of his claim that the police's misconduct in eliciting the false confession and causing his wrongful conviction was improper]).[9]

_____

[9] Aside from an oblique reference to the issue in their brief, defendants do not directly assert that the suppression court's ruling on the voluntariness of plaintiff's confession

Turning to plaintiff's malicious prosecution claims, the evidence that the detectives falsified plaintiff's confession and provided the confession to the District Attorney's Office for use in the prosecution of plaintiff created a triable issue of fact on the commencement element of malicious prosecution. Because it is undisputed that the detectives who participated in the creation of the confession also had it sent to the District Attorney's Office, those detectives knew or should have known that their submission of the plaintiff's unequivocal admission to killing Acuna would cause prosecutors to bring a criminal proceeding against plaintiff, and consequently, the detectives' role in commencing the prosecution, coupled with plaintiff's testimony about the falsity of the confession, yielded a triable issue of fact on the commencement element of her malicious prosecution claim.

Additionally, the proof recounted above, from which the falsification of evidence and the absence of probable cause could be inferred, produced a triable issue of fact regarding whether probable cause supported plaintiff's prosecution. Because evidence that a police officer lacked probable cause to believe that the plaintiff committed a crime and provided a falsified confession to prosecutors can rebut the presumption of probable

should entirely estop plaintiff from asserting that her confession was involuntary and false. And, defendants did not preserve such a claim below. Under these circumstances, we decline to address any collateral estoppel issues in this case.

cause arising from an indictment (see Colon, 60 NY2d at 82-83),
the evidence here that the detectives did not have probable cause
to believe that plaintiff had killed Acuna, made a fake
confession, attributed the confession to plaintiff and gave it to
prosecutors could, if credited, overcome the presumption of
probable cause arising from plaintiff's indictment.  And, since
evidence of bad faith conduct in an infirm prosecution can also
support an inference of malice (see Hopkinson, 249 NY at 300),
this evidence further generated a triable issue of fact as to
whether the detectives maliciously commenced the criminal
proceedings against plaintiff.  Thus, for the foregoing reasons,
we hold that the courts below erred in granting summary judgment
to all defendants on plaintiff's state law claims and to the
individual defendants on her claims under 42 USC § 1983.

                                  C

        While plaintiff maintains triable claims against the
individual defendants under federal law, the same is not true of
her federal civil rights claims against the City and the NYPD.
As previously noted, plaintiff can proceed to trial against the
governmental defendants on her claims under 42 USC § 1983 only if
the record discloses a triable issue of fact as to whether an
official policy or custom of the City government itself caused
the detectives to violate her constitutional rights.  Under
Monell v New York City Dept. of Social Servs. (436 US 658) and
its progeny, "[o]fficial municipal policy includes the decisions

of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law" (Connick v Thompson, 563 US 51, 61 [2011]; see Simpson v New York City Transit Authority, 112 AD2d 89, 91 [1st Dept 1985], affd 66 NY2d 1010 [1985]).  Stated differently, the existence of such a policy may be shown by proof that the municipality had a custom or practice that was both widespread and reflected a deliberate indifference to its citizens' constitutional rights (see id. at 60-62; Bd. of the County Comm'rs of Bryan Cnty., Okla. v Brown, 520 US 397, 403-407 [1997]; Oklahoma City v Tuttle, 471 US 808, 819-823 [1985]; Jones v Town of East Haven, 691 F3d 72, 80 [2d Cir 2012]).  Furthermore, to render the City liable under section 1983, the City's custom or practice had to be the "moving force" behind plaintiff's constitutional injury (Brown, 520 US at 404; see Surprenant v Rivas, 424 F3d 5, 19 n6 [1st Cir 2005]).

Here, the evidence does not support an inference that the City and the NYPD had a widespread custom of arresting people in violation of their constitutional rights, nor is there any proof that such a policy caused the allegedly wrongful arrest and prosecution of plaintiff.  On this subject, plaintiff points to only two pieces of evidence that purportedly expose the existence of a municipal policy or practice of making unfounded arrests: (1) the testimony of her expert witness, Evrard Williams, who last served on the police force in the 1980s, that he believed

that police officials regularly pressured detectives to quickly close homicide cases by making arrests, even without probable cause; and (2) Detective McEntee's testimony that, as part of the NYPD performance evaluation process, the department considered a detective's record of closing cases with arrests.  But those pieces of evidence fail to create a triable issue of fact on the official policy element of plaintiff's federal claims against the City.

Notably, plaintiff's expert offered no factual support, beyond his recitation of plaintiff's account of her arrest, for his belief that the NYPD had a policy of pressuring police officers to quickly arrest homicide suspects, nor could his familiarity with NYPD policy during the 1980s have supplied an adequate basis for his unsubstantiated opinion about any policy in effect at the time of plaintiff's arrest decades later.  In addition, although Detective McEntee testified that NYPD supervisors generally took a detective's case closure rate into account in analyzing his or her performance, the NYPD's practice of incentivizing arrests via a multi-factor evaluation does not in itself amount to a practice of promoting arrests without probable cause.  Moreover, even if plaintiff had established the existence of a municipal practice of promoting arrests without probable cause in homicide cases, neither Williams nor McEntee alleged facts establishing that any particular policy in effect at the time of plaintiff's arrest was the cause of the

detectives' decision to arrest her.  Therefore, on this record, there is no triable issue of fact as to whether an official City policy caused the police to unlawfully arrest plaintiff, and the lower courts properly granted summary judgment to the City and the NYPD on plaintiff's claims under 42 USC § 1983.

### D

On a final note, while we agree with plaintiff that the courts below improperly granted summary judgment to the individual defendants on her claims, we reject her argument that the detectives' suppression hearing testimony that her confession was voluntary, as opposed to their transmission of the sham confession to the prosecutors in the first instance, may on its own result in liability for the commencement or continuation of the prosecution for purposes of her malicious prosecution claims. As a matter of historically-rooted public policy, a witness cannot be liable for malicious prosecution based on his or her false testimony at a trial or pretrial proceeding, such as a grand jury proceeding (see Rehberg, 132 S Ct at 1510; Briscoe v Lahue, 460 US 325, 329-336 [1983]; see also Dobbs' Law of Torts § 587 [2d ed. 2011]), and courts have extended this rule to eliminate liability arising from a police officer's false testimony at a suppression hearing (see Curtis v Bembenek, 48 F3d 281, 284 [7th Cir 1995]; Daloia v Rose, 849 F2d 74, 76 [2d Cir 1988]; Holt v Castaneda, 832 F2d 123, 124-125 [9th Cir 1987]). Drawing on the same underlying body of common law, we have

recognized the need to shield grand jury witnesses from liability for defamation based on their testimony, and we have generally observed that public officials would be unduly deterred from the full and frank discharge of their duties were their false statements, made in the course of their official functions or in judicial proceedings, to become the source of civil liability (see Toker v Pollak, 44 NY2d 211, 219-220 [1978]; see also Pecue v West, 233 NY 316, 319-320 [1922]).  On the other hand, there may well be cases in which a witness's improper act of testifying in itself is such an appalling betrayal of justice, and such an abuse of the immunity that ordinarily attaches to testimony, that the immunity must yield.

However, here, while the testimony may not serve as a separate act of commencement or continuation, it is relevant evidence that the officers had a malicious state of mind in creating and transmitting the falsified confession.  The test is "whether the plaintiff can make out the elements of his [or her] § 1983 claim without resorting to the . . . testimony.  If the claim exists independently of the . . . testimony, it is not 'based on' that testimony . . . [c]onversely, if the claim requires the . . . testimony, the defendant enjoys absolute immunity" (Coggins v Buonora, 776 F3d 108, 113 [2d Cir 2015], cert denied, 135 S Ct 2335 [2015]).  Given the strong public policy against liability based on testimony in judicial proceedings, the detectives here should not, at least on this

record, be subjected to potential liability for their testimony at the suppression hearing alone.  But because plaintiff relies on evidence independent of the suppression hearing testimony, the detectives may not invoke absolute immunity.[10]

In addition, our decision to vitiate the grant of summary judgment to defendants does not imply that plaintiff is entitled to summary judgment or should necessarily win at trial on her claims.  The evidence simply discloses triable issues of fact that must be resolved by the jury rather than by the court as a matter of law (see Munoz, 18 NY2d at 11; see also Hyman v New York C. R. Co., 240 NY 137, 143 [1925]).  At trial, the jury remains free to infer the presence or absence of the elements of false arrest and malicious prosecution from this evidence as it

---

[10]  In Colon v New York (60 NY2d 78), we suggested that a police officer might be liable for hiding material exculpatory evidence from, or providing false evidence to, "either . . . the Grand Jury or . . . the District Attorney" (id. at 82-83 [emphasis added]).  But, in making this observation, we did not rule that a police officer's testimony per se, as distinct from his or her provision of fabricated evidence to the prosecuting authority in a manner designed to commence the prosecution in the first instance, is generally an appropriate basis in itself for liability for malicious prosecution.  Rather, our comment was consistent with the rule of immunity applicable to a "complaining witness" under the common law.  Indeed, as the Supreme Court of the United States recently explained, the common law has long regarded a person who instigates a prosecution as the "complaining witness" and hence permits a suit against that person based on his or her non-testimonial conduct in commencing the prosecution, but common-law principles nonetheless cloak a witness in the grand jury, including a law enforcement agent who acts as a "complaining witness," with immunity in connection with his or her testimony (see Rehberg, 132 S Ct at 1502-1510).

sees fit, and it can reach different conclusions regarding distinct elements based on the same body of evidence.

Further, our decision does not signal that every allegation of the falsification of material evidence is a talisman shielding a plaintiff from summary judgment. It remains the law that a plaintiff's vague and conclusory assertions that the police fabricated evidence are insufficient to enable false arrest and malicious prosecution claims to survive a summary judgment motion (see Phillips v City of Syracuse, 84 AD2d 957, 957 [4th Dept 1981], affd 57 NY2d 996 [1982]). But, where, as here, the plaintiff provides detailed sworn testimony about the police's creation and dissemination of critical fabricated evidence and the remaining proof does not eliminate all questions as to probable cause, the defendant officers cannot win summary judgment.

Lastly, as defendants do not dispute, Supreme Court erroneously dismissed plaintiff's claims against Detective Corey on the ground that she failed to timely request a default judgment against Corey based on his failure to answer in these actions. At the start of Corey's deposition, counsel for the City stated that he represented Corey in the actions and waived all jurisdictional defenses on the detective's behalf. As a practical matter, then, Corey appeared in this action and, in any event, unequivocally waived any right to dismissal that he might have had, including his right to dismissal upon plaintiff's

failure to timely seek a default judgment under CPLR 3215 (c). In light of counsel's declarations, plaintiff's evident desire to continue the actions against all defendants and the City's inability to identify any reason to strictly enforce the statute against plaintiff, Supreme Court improperly dismissed plaintiff's claims against Corey, which should be reinstated (see generally HSBC USA v Lugo, 127 AD3d 502, 503 [1st Dept 2015]; Myers v Slutsky, 139 AD2d 709, 710 [2d Dept 1988]; cf. Perricone v City of New York, 62 NY2d 661, 663 [1984]).

III.

The evidence in this case raises triable issues of fact regarding plaintiff's common-law false arrest and malicious prosecution causes of action against only Detectives Corey, Santiago, Guerra and Hendricks, as well as the governmental defendants, thereby enabling her to proceed to trial on those claims. Likewise, the record reveals the existence of triable issues of fact on plaintiff's federal civil rights claims against the aforementioned detectives. Thus, defendants' motion for summary judgment on those claims should have been denied. However, since the record is devoid of proof that an official City policy resulted in the allegedly wrongful arrest and prosecution of plaintiff, the courts below properly granted summary judgment to the governmental defendants on plaintiff's claims under 42 USC § 1983. Finally, beyond the dismissal of plaintiff's 42 USC § 1983 claims against the City on Monell

grounds, it is undisputed that the lower courts properly dismissed plaintiff's other claims in the first action, and hence the Appellate Division's affirmance of Supreme Court's August 10, 2012 order should not be disturbed.  Accordingly, the order of the Appellate Division should be modified, without costs, in accordance with this opinion, and as so modified, affirmed.

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

Order modified, without costs, in accordance with the opinion herein and, as so modified, affirmed.  Opinion by Judge Abdus-Salaam.  Judges Pigott, Rivera, Stein and Fahey concur. Chief Judge DiFiore and Judge Garcia took no part.

Decided February 23, 2016