Wᴉʟʟɪᴀᴍ Cᴀʀᴅᴏᴢᴀ, Appellant, et al., Plaintiff, v Cɪᴛʏ ᴏꜰ Nᴇᴡ Yᴏʀᴋ et al., Respondents, et al., Defendants.

First Department, April 12, 2016

152 ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

## APPEARANCES OF COUNSEL

*Pollack, Pollack, Isaac & DeCicco, LLP*, New York City (*Brian J. Isaac* of counsel) and *Burns & Harris*, New York City (*Christopher J. Donadio* of counsel), for appellant.

*Zachary W. Carter, Corporation Counsel*, New York City (*Dona B. Morris, Pamela Seider Dolgow* and *Lavanya Pisupati* of counsel), for respondents.

## OPINION OF THE COURT

KAPNICK, J.

In this action alleging, inter alia, excessive force and malicious prosecution, plaintiff William Cardoza (plaintiff or Cardoza) appeals from an order of Supreme Court, Bronx County (Howard H. Sherman, J.), entered March 18, 2014, to the extent it granted defendants City of New York, Police Officer Benjamin Perez, and Police Officer Carlos Mendez's CPLR 4404 motion to set aside the part of the jury verdict finding Perez li-

able for malicious prosecution and Perez and Mendez liable for punitive damages, and ordered a new trial on damages on the excessive force claim against Mendez unless plaintiff agreed to a reduction from $500,000 to $200,000 for past pain and suffering and from $2 million to $150,000 for future pain and suffering.[1]

Plaintiff also appeals from an order of the same court and Justice, entered March 19, 2014, which denied as moot his motion for legal fees pursuant to 42 USC § 1988.

Background

On May 30, 2008, at approximately 8:30 p.m., New York City Police Officers Perez, Mendez, and Steven Tomala confronted plaintiff while he was in possession of and drinking alcohol from an open container in front of the Bronx building where he lived. At trial, the officers testified that, when plaintiff failed to comply with their requests to produce identification, and attempted to walk away, they proceeded to arrest him. According to the officers, he resisted, refusing to turn around so they could handcuff him, tensing and flailing his arms, and refusing to let go of a fence or gate along the side of the building. Mendez then struck plaintiff's hand three to five times with a baton to get him to let go. This resulted in a displaced, comminuted, open fracture to the second metacarpal bone of plaintiff's right hand. Mendez also pepper-sprayed plaintiff in the course of the altercation. Plaintiff contended that he did not understand English, was attempting to comply, and did not resist arrest. The entire incident was captured by a video surveillance camera, and the recording was entered into evidence during the trial. The video depicts plaintiff standing on the threshold of his building between the sidewalk and the entrance, looking into an area of the building area that his wife described as a courtyard.

Plaintiff testified at trial, through a Spanish interpreter, that on the day of the incident, he finished work at 4:30 p.m., returned home, and cooked food, which he brought to his wife and daughters, who were downstairs in front of the building. Plaintiff, who was 49 years old at the time, also testified that he drank two or three beers while cooking, and brought a beer

---

1. The complaint also asserted causes of action on behalf of plaintiff Vielka De Leon, Cardoza's wife. The jury found in favor of defendants on all claims by De Leon and they are not at issue on this appeal. Also, defendants are not cross-appealing from the trial court's order declining to set aside the jury's finding of liability on plaintiff's excessive force claim.

downstairs with him. His wife testified that she was in the building's courtyard with her daughters when plaintiff came downstairs. Plaintiff testified that he was standing near the entrance, facing the building, when the police approached him and spoke to him in English, which he does not understand. His wife, who speaks English and Spanish, told him that they were requesting identification. Plaintiff testified that he took out his wallet, but could not see well because it was dark and overcast, so he attempted to move toward a light. He recalled that when he turned to pull out his wallet, he was pepper-sprayed in the eyes, and could not see. He testified that he was struck with what he described as a metal tube six or seven times on his right arm, although he did not attempt to punch any of the officers, kick them, push them, prevent them from putting his hands behind his back, or resist them.

On cross-examination, while watching the surveillance video, plaintiff agreed with defendants' counsel that the officers approached him and spoke with him for 30 seconds, before he took two steps away from them toward the light. At that time, they pushed him against the wall of the building, and 10 seconds later, they pepper-sprayed him. The video shows that Mendez turned plaintiff around, grabbed hold of his right hand, and placed it behind his back. Plaintiff acknowledged that the video showed him pulling his hand back in front of his body and grabbing the fence as Mendez pulled on him in an effort to get him to let go. He testified that he did not remember holding onto the fence. Instead, he testified that he had his hand against the wall to prevent himself from falling as the officers were pulling on him. When shown the portion of the surveillance video where he grabbed the fence, he responded, "What I'm seeing is I'm there, but that I'm trying not to be arrested."

Continuing to watch the video, he agreed that it showed Mendez turn against the wall and try to push him away from the wall, but he did not let go, and Mendez then grabbed his arm, but he still did not let go. Plaintiff testified that, at that point, Mendez hit him with a baton. The video shows that Mendez struck plaintiff's right arm or hand with a baton three to five times. Other officers were lifting plaintiff's left leg and pulling on it, while plaintiff continued to hold something in the wall with his right hand, before he collapsed onto the sidewalk.

After plaintiff let go, it took approximately 30 seconds for the officers to handcuff him. The entire encounter took just under two minutes, beginning from when Perez first approached plaintiff.

Plaintiff's wife testified that when the officers approached her husband and requested identification, she told them that he did not understand English, and she told him that they wanted to see his identification. According to her, after he took his wallet out, he did not get a chance to open it because "they [were] all over him." She jumped between him and the officers, but was led away by another officer. She maintained that the entire time she was on the street, she heard the officers speaking only in English.

Mendez testified that on the evening of the encounter, he, Perez and Tomala had been assigned to address quality of life issues, such as public drinking, public urination, selling drugs from corners or buildings, jaywalking, and riding bicycles on sidewalks. Perez testified that from the car they were in, he observed plaintiff in front of the building with an open container. He stepped out, approached plaintiff, and asked him for identification twice, in English. The first time, plaintiff did not respond. The second time plaintiff answered, "No ID," and Perez asked him again in Spanish, in case he did not understand. After being asked multiple times, however, plaintiff did not produce identification, and attempted to walk away.

Mendez testified that, while dealing with other people nearby, he heard plaintiff saying that he would not give Perez his identification. Mendez, who is fluent in English and Spanish, then joined Perez and requested identification. While Mendez could not recall whether he and Perez spoke with plaintiff in English or Spanish, he testified that he did not get the impression that plaintiff did not understand. He testified that plaintiff took his wallet out, but refused to provide any identification. At that point, he was placed under arrest, at which point he attempted to walk past the officers, who pushed him back against the wall. Mendez testified that lighting conditions were "ideal," and plaintiff never indicated that he needed additional light.

Mendez testified that after he and Perez pushed plaintiff back against the wall, plaintiff did not comply with their orders that he was under arrest, and refused to give them his hands. Mendez tried to grab plaintiff's hands, but plaintiff's arms were at his sides, and he remained stiff for about 10 to 15 seconds before Mendez pepper-sprayed him.

At that time, plaintiff's wife intervened and was led away by Tomala, at which time Mendez was able to turn plaintiff around, briefly getting at least one of plaintiff's hands behind

his back before plaintiff moved it forward again and grabbed the fence. Perez and Mendez pulled on plaintiff, trying to pry his grip loose from the fence. Tomala joined them, and grabbed plaintiff's left leg. He testified that when he grabbed plaintiff's leg, plaintiff attempted to "kick his way out of it," pulling his leg back and forth like a tug of war.

Perez testified that when plaintiff's left hand came loose from the fence, he swung his arm at Perez with a closed fist. Tomala described it as plaintiff swinging an arm so he would not be handcuffed. When confronted with the statement in the criminal complaint he signed that plaintiff swung a closed fist at him, Perez stated, "I never said he tried to punch me." Perez also testified that, although it is not visible on the video, plaintiff shuffled his feet, kicking Perez's feet in the process.

Having failed to remove plaintiff's right hand from the fence, Mendez removed his baton and struck plaintiff's hand until he let go of the fence. Mendez described the level of force of the first strike as "medium," and the subsequent strikes as "less."

Tomala, who was the last to join Perez and Mendez in dealing with plaintiff, testified that he spoke to plaintiff in English, as did Perez and Mendez.

Plaintiff was taken to the police precinct in a car, and was subsequently taken to a hospital, where he had surgery on his right hand. He remained in custody until June 5, 2008, handcuffed to the hospital bed until he was released on his own recognizance when the hospital discharged him.

Perez, the arresting officer, created the arrest report and signed the criminal complaint prepared by the Bronx County District Attorney's Office. The brief narrative in the arrest report stated that, after plaintiff was observed consuming alcohol, he refused to produce identification, remained uncooperative, "and did swing at arresting officer, refusing to be taken into custody. While attempting to arrest defendant [plaintiff], OC spray was used to subdue him. Defendant [plaintiff] was also struck with baton to be subdue[d]." An online booking worksheet further noted that plaintiff did not use any physical force. The criminal complaint charged plaintiff with resisting arrest and disorderly conduct,[2] but not an open container violation, and stated that he "began to flail his arms and twisted

---

2.  "A person is guilty of resisting arrest when he intentionally prevents or attempts to prevent a police officer or peace officer from effecting an authorized arrest of himself or another person" (Penal Law § 205.30). "A person is guilty of disorderly conduct when, with intent to cause public

his body, swung his closed fists at deponent, kicked him in his feet, and twisted his body preventing deponent from placing him in handcuffs."

Ultimately, the Bronx District Attorney's Office called Tomala as the only witness, and proceeded with the criminal trial only on the charge of disorderly conduct, which was dismissed for failure to prove a prima facie case at the end of the People's case.

In the civil trial, plaintiff called as a medical expert Dr. Jerry Lubliner, a board-certified orthopedic surgeon. Dr. Lubliner testified that, as a result of being struck on the hand, plaintiff suffered a displaced, comminuted, open fracture to the second metacarpal bone of his right hand and a fracture of his right index finger. Plaintiff underwent open reduction internal fixation surgery with wires to hold the second metacarpal together. Dr. Lubliner examined plaintiff in September 2010, more than two years after the incident, at which time he observed muscle loss in plaintiff's right forearm and swelling in his right wrist. Plaintiff's grip in his dominant right hand was 60% weaker than in his left, and based on an active range of motion test, plaintiff had a 50% loss in his right index finger's range of motion. Dr. Lubliner opined that the injuries were permanent in nature and that plaintiff was unlikely to ever be able to make a fist or regain the strength in his right hand.

Plaintiff also called Dr. Hugo Morales, a licensed psychiatrist, whom plaintiff began seeing a month and a half after the incident, after being referred by counsel. Plaintiff was still seeing Dr. Morales at the time of trial. Dr. Morales testified that he took a history from plaintiff and his wife, establishing, among other things, that plaintiff had been a good-natured person who had never been mentally sick before the incident. However, plaintiff told him that after the incident, he became isolated, fearful and depressed. He could not sleep, felt useless, had suicidal ideations, and was unable to enjoy or participate in social activities.

Dr. Morales diagnosed plaintiff with post-traumatic stress disorder and major depressive disorder as a result of the incident. He opined that plaintiff would need treatment for "10 to 15, 20 years." He explained that post-traumatic stress disorder "occurs after the individual has suffered what the

---

inconvenience, annoyance or alarm, or recklessly creating a risk thereof: . . . He engages in fighting or in violent, tumultuous or threatening behavior" (Penal Law § 240.20 [1]).

individual perceived [sic] a threat to a [sic] physical and mental well being by trauma." The symptoms of post-traumatic stress disorder are flashbacks and nightmares, arousal or agitation, and avoidance of situations that will trigger memories of the trauma. Dr. Morales testified that plaintiff has experienced each of these symptoms.

Defendants called Dr. Ramesh Gidumal, a board-certified orthopedic surgeon, who examined plaintiff and testified that both bones had healed completely and properly, that plaintiff had "virtually a full range of motion" and could open and close his right hand. Dr. Gidumal stated that although the range of motion plaintiff demonstrated in his right index finger was less than in his left, plaintiff was resisting, and would not allow him to bend the index finger. He noted that the X ray report from the night of the incident stated that plaintiff might have an old fracture to his right thumb.

Dr. Gidumal further stated that a grip strength test for the right hand resulted in variable readings, indicating that plaintiff was not giving maximum effort. He opined that plaintiff had "no or minimal loss of function of his finger," and could lift, carry, grasp and manipulate objects, including screwdrivers, hammers, and perform plastering and painting type work. He further opined that plaintiff's failure to follow up with physical therapy was "a major cause for his minor limitations and motion." He opined that plaintiff had "no or minimal objective evidence of a problem, and therefore [was] not disabled from this injury."

Dr. William Kaplan, a board-certified psychiatrist, also examined plaintiff on behalf of defendants, and opined that plaintiff did not meet the criteria for a diagnosis of post-traumatic stress disorder. Specifically, he testified that the first criterion is that the incident must:

> "rise to a certain level where the individual was threatened with severe bodily harm or realized he was threatened with death, so it's obviously something very serious, and you have to have experienced that, and it could be something, a natural disaster, you are in, you know, a tsunami or a hurricane or a tornado, or it could be an assault, that somebody did something very bad to you like a rape or a situation where you thought, you know, 'I could be seriously injured or even killed in this situation,' and that has to happen. Then you also have to have

experienced a sense of helplessness or hopeless-
ness, or feeling absolutely overwhelmed, like this is
something way beyond the control of what you
could normally deal with or handle."

He explained that he had watched the video of the confronta-
tion and it showed a "step-wise graduated response" involving
a "back and forth" with the officers, and was not life-threatening
or beyond plaintiff's control to manage.

Responding to specific interrogatories on the verdict sheet,
the jury found that Mendez used excessive force in arresting
plaintiff, which violated plaintiff's civil rights pursuant to 42
USC § 1983, and that Perez knowingly provided false informa-
tion to the District Attorney's Office, resulting in plaintiff's
prosecution, which violated his civil rights. Regarding the mali-
cious prosecution claim, the jury responded affirmatively to the
second interrogatory, which read: "Did plaintiff prove by a
preponderance of the evidence that Officer Perez knowingly
provided false information to the Office of the District Attorney
which resulted in William Cardoza's prosecution?"

The jury awarded plaintiff $500,000 for past pain and suffer-
ing and $2 million for future pain and suffering, intended to
provide compensation for a period of 15 years. The jury also
found, by clear and convincing evidence, that plaintiff was
entitled to punitive damages against Perez and Mendez for
violating his civil rights, and awarded him $750,000 in puni-
tive damages against each, for a total verdict of $4 million.

After the trial, defendants moved, pursuant to CPLR 4404,
to set aside the verdict and grant judgment for them, on the
ground that plaintiff failed to establish a prima facie case as to
his causes of action for malicious prosecution, assault and
battery/excessive force and punitive damages, or, alternatively,
to set aside the verdict as against the weight of the evidence,
in the interest of justice and/or based on the damages being
excessive, and grant a new trial. Plaintiff moved for attorneys'
fees, pursuant to 42 USC § 1988, as the prevailing party on his
federal civil rights claims under 42 USC § 1983.

Supreme Court granted defendants' motion insofar as it
sought to set aside the jury verdict on the claims for malicious
prosecution and punitive damages, finding that they were not
supported by the record and that plaintiff had not proved a
prima facie case. The court also ordered a new trial on dam-
ages unless plaintiff stipulated to a reduction from $500,000 to
$200,000 for past pain and suffering and from $2,000,000 to
$150,000 for future pain and suffering.

Based on the video recording of the incident and plaintiff's testimony, including his statement that "he did not want to be arrested," the trial court held that there was insufficient evidence as a matter of law for the jury to have found for plaintiff on his malicious prosecution claim. The court further held that the record contained no showing of false statements, and thus plaintiff had failed to establish malice, which was necessary for a prima facie case of malicious prosecution and to sustain his claim for punitive damages. The court refused to disturb so much of the jury verdict as found Mendez liable for excessive force.

The court further held that the awards of $500,000 for past pain and suffering and $2 million for future pain and suffering over 15 years deviated from what would constitute reasonable compensation for plaintiff's injuries, based on a review of "prior verdicts for such injuries." With regard to plaintiff's hand injury, the court noted that plaintiff had not received any treatment since 2009 and that the extent of residual effects and permanency of that injury were in dispute. With regard to plaintiff's claim of post-traumatic stress disorder, the court noted that "discrepancies" existed in the testimony of plaintiff's expert concerning the facts underlying the incident and the detailed testimony of defendants' expert that plaintiff did not meet the criteria of post-traumatic stress disorder. In a separate order, the court denied plaintiff's motion for attorneys' fees as moot.

Discussion

Where, as here, a jury verdict is set aside on the ground that, as a matter of law, it is not supported by sufficient evidence, the relevant inquiry for this Court is whether "there is simply no valid line of reasoning and permissible inferences which could possibly lead rational [people] to the conclusion reached by the jury on the basis of the evidence presented at trial" (*Cohen v Hallmark Cards*, 45 NY2d 493, 499 [1978]).[3] Further,

> "in any case in which it can be said that the evidence is such that it would not be utterly irrational for a jury to reach the result it has

**3.** Setting aside a verdict as against the weight of the evidence is quite different from setting it aside for insufficient evidence as a matter of law, in that, among other things, the former requires a new trial rather than a judgment in favor of the moving party (*Cohen*, 45 NY2d at 498; *see also* Siegel, NY Prac § 405 [5th ed 2011]).

determined upon, and thus a valid question of fact does exist, the court may not conclude that the verdict is as a matter of law not supported by the evidence" (*id.*).

Applying these principles in the instant context, we are asked to consider whether there is simply no valid line of reasoning or permissible inferences that could have led the jury to find in favor of plaintiff on his claims for malicious prosecution and punitive damages.

"The tort of malicious prosecution protects the personal interest of freedom from unjustifiable litigation[,] . . . [t]he essence [of which] is the perversion of proper legal procedures" (*Broughton v State of New York*, 37 NY2d 451, 457 [1975], *cert denied* 423 US 929 [1975]). To sustain a claim for malicious prosecution, a plaintiff must establish the following elements: (1) the initiation of a criminal proceeding against him or her, (2) termination of the proceeding in his or her favor, (3) lack of probable cause for the criminal proceeding, and (4) actual malice (*id.*; *see also De Lourdes Torres v Jones*, 26 NY3d 742 [2016]). "Failure to establish any one of these elements defeats the entire claim" (*Brown v Sears Roebuck & Co.*, 297 AD2d 205, 208 [1st Dept 2002]). Since the first two elements are not disputed by defendants on appeal, we will discuss probable cause and actual malice only.

The element of lack of probable cause traditionally looks to whether probable cause existed to commence the criminal proceeding (*Broughton*, 37 NY2d at 451), not whether there was probable cause to arrest the plaintiff. As plaintiff argues, a party may establish that there was a lack of probable cause to commence a criminal proceeding by proving that there was no probable cause to arrest in the first place (*see Brown*, 297 AD2d at 211). However, plaintiff did not actually pursue this theory at trial. A review of the record reveals that the issue of probable cause to arrest was never submitted to the jury, because plaintiff's false arrest claim was previously dismissed on a motion by defendants for summary judgment (Kibbie F. Payne, J.). The trial court did specifically charge the jury as follows: "I will remind you now again the arrest in this case of Mr. Cardoza is not the issue in terms of the legality of the arrest. [There] has already been a finding that it was proper and legal to arrest Mr. Cardoza." In fact, the issue submitted to the jury on the malicious prosecution claim was framed by the court in its charge as whether plaintiff had established "that *at the*

*time the prosecution was initiated*, the defendants . . . did not have probable cause to believe that William Cardoza was guilty of the crime of resisting arrest, or the violation of disorderly conduct and that the defendants acted maliciously" (emphasis added).

Despite the arguments put forth by the parties and the statements made by the court in its posttrial decision, the issue of whether there was probable cause to arrest plaintiff was never submitted to the jury. Nor did the jury make a finding, contrary to the trial court's analysis, that probable cause to arrest did not exist in this case.[4] Rather, the only question submitted to the jury on the verdict sheet regarding malicious prosecution was whether Perez knowingly provided false information to the Office of the District Attorney, resulting in plaintiff's prosecution. Thus, we must examine how the jury's response to this one question supports findings that defendants both lacked probable cause to prosecute and possessed actual malice, so as to satisfy the elements of the malicious prosecution claim.

"In the context of a malicious prosecution claim, probable cause under New York law is the knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of" (*Rounseville v Zahl*, 13 F3d 625, 629-630 [2d Cir 1994] [internal quotation marks omitted]). Stated another way, "Probable cause consists of such facts and circumstances as would lead a reasonably prudent person in like circumstances to believe plaintiff guilty" (*Colon v City of New York*, 60 NY2d 78, 82 [1983]). Here, it appears that plaintiff endeavored to prove that at the time the prosecution was initiated, a reasonably prudent officer would not have believed that plaintiff was guilty of resisting arrest and disorderly conduct based on the facts then known to defendants, as shown via the surveillance video and other testimony. By determining that Perez knowingly provided false information to the prosecutor, the jury essentially rejected defendants' claim that they had probable cause to believe that plaintiff was guilty of resisting arrest and acting in a disorderly manner by

---

4. The court, in its posttrial decision, inexplicably stated that "Judge Payne's decision leaves the issue of whether or not the police had probable cause to arrest plaintiff for resisting arrest and disorderly conduct to the jury[,]" and that "[t]he jury found probable cause did not exist," which it did not.

kicking and swinging his fists.[5] The jury was free to assess the surveillance video and the other testimony and determine whether plaintiff behaved in a manner that would support the charges of resisting arrest and disorderly conduct, as defendants claimed, or, did not act in such a manner, as plaintiff claimed.

The actual malice element "does not require a plaintiff to prove that the defendant was motivated by spite or hatred, although it will of course be satisfied by such proof" (*Nardelli v Stamberg*, 44 NY2d 500, 502-503 [1978]). Since "[a]ctual malice is seldom established by direct evidence of an ulterior motive" (*Martin v City of Albany*, 42 NY2d 13, 17 [1977]), it "may be proven by circumstantial evidence" (*Nardelli*, 44 NY2d at 502), and depends "upon inferences to be reasonably drawn from the surrounding facts and circumstances" (*Martin*, 42 NY2d at 17). Actual malice may also be inferred from a total lack of probable cause (*id.*; *see also* 2A NY PJI3d 3:50.4 at 520 [2016]) or from defendant's intentionally providing false information to law enforcement authorities (*Robles v City of New York*, 104 AD3d 829 [2d Dept 2013]). It is important to note that the lack of probable cause and actual malice elements are independent, and "a jury may, but is not required to, infer the existence of actual malice from the fact that there was no probable cause to initiate the proceeding" (*Martin*, 42 NY2d at 17). As a result, it is advisable to separate the questions of probable cause and malice on a verdict sheet (*see* 2A NY PJI3d 3:50.4 at 520 [2016]). Here, however, while there was only one question, the trial court did charge the jury on both the elements of probable cause and malice, and instructed the jury that only if they found that "plaintiff . . . prove[d] *both* that the defendants did not have probable cause *and* that they acted maliciously" (emphasis added) should they move on to consider damages, which they did.

 Based on the foregoing, and contrary to the trial court's finding, the jury's verdict on malicious prosecution was improperly set aside as insufficient as a matter of law. It cannot be said that there was no valid line of reasoning that could possibly have led rational people to the conclusion reached by the jury on the basis of the evidence at trial. Moreover, the court impermissibly usurped the jury's role and made factual determinations. The court's statement that the plaintiff

---

5. Indeed, in accordance with PJI 3:50, the jury was charged with the elements of the crimes of resisting arrest and disorderly conduct.

"refus[ed] to submit to the authority of the police" is a clear example of the court substituting its judgment for that of the jury. When the facts give rise to conflicting inferences, as they do here, it is for the jury, not the court, to resolve those conflicts. Accordingly, the jury's verdict in favor of the plaintiff on his malicious prosecution claims under state law and 42 USC § 1983 must be reinstated.[6]

With respect to the issue of punitive damages, questions 8 and 10 of the verdict sheet asked the jury if plaintiff was entitled to punitive damages for a violation of plaintiff's civil rights. This signals that the punitive damages were tied to plaintiff's constitutional tort claims under 42 USC § 1983, which stemmed directly from plaintiff's excessive force[7] and malicious prosecution claims. In setting aside the punitive damages award, the trial court failed to distinguish the punitive damages awarded in questions 8 and 9 ($750,000 against Perez), which are connected to the section 1983 malicious prosecution claim, from the punitive damages awarded in questions 10 and 11 ($750,000 against Mendez), which correlates to the section 1983 excessive force claim. The court commented generally that plaintiff was not entitled to punitive damages. We will now consider the viability of each award.

■ "Punitive damages are available in § 1983 actions when a defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to federally-protected rights of others" (2A NY PJI3d 3:60.4 at 689 [2016], citing *Smith v Wade*, 461 US 30 [1983]). Moreover,

---

6. Although the trial court failed to specifically address this claim in its posttrial decision, the jury did find for plaintiff on his 42 USC § 1983 claim based on malicious prosecution. We assume from the trial court's discussion that it intended to set aside this jury finding for the same reasons that the state law malicious prosecution claim was set aside. Indeed, the two claims are virtually identical (*see De Lourdes Torres*, 26 NY3d at 762). "[T]o assert a § 1983 action based on malicious prosecution, the plaintiff must show: a sufficient restraint on his or her liberty to implicate fourth amendment rights; that the defendant initiated . . . the prosecution against the plaintiff without probable cause; that the defendant acted maliciously; and that the proceeding terminated in plaintiff's favor" (2A NY PJI3d 3:60.4 at 676 [2016]; *see Fulton v Robinson*, 289 F3d 188, 195 [2d Cir 2002]).

7. "A § 1983 claim may be brought for the use of excessive force in violation of the Fourth Amendment to the United States Constitution" (2A NY PJI3d 3:60.2 at 671 [2016], citing *Delgado v City of New York*, 86 AD3d 502 [1st Dept 2011]). Again, despite the fact that the trial court did not specifically address plaintiff's section 1983 claims, it does appear that the excessive force section 1983 claim was not set aside. Therefore, we do not address it on the merits.

"[p]unitive : . . . damages have been allowed in cases where the wrong complained of is morally culpable, or is actuated by evil and reprehensible motives, not only to punish the defendant[,] but to deter him, as well as others who might otherwise be so prompted, from indulging in similar conduct in the future" (*Walker v Sheldon*, 10 NY2d 401, 404 [1961]). Here, contrary to the trial court's assessment, there was evidence from which the jury could have reasonably concluded that Perez and Mendez acted with reckless indifference or malice when they, respectively, initiated the prosecution against plaintiff without probable cause and used excessive force in effecting his arrest. Although the jury's punitive damages awards may be excessive, it cannot be said that plaintiff is not entitled to these damages as a matter of law.

In reviewing the excessiveness of the punitive damages awards, the issue is whether they "deviate[ ] materially from what would be reasonable compensation" (CPLR 5501 [c]). "The method of [this] review is to evaluate whether the appealed award deviates materially from comparable awards" (*Donlon v City of New York*, 284 AD2d 13, 15 [1st Dept 2001]). Here, a review of analogous cases reveals that the punitive damages awarded by the jury fall far outside the boundaries of previous awards in similar section 1983 cases.

In *O'Neill v Krzeminski* (839 F2d 9, 13-14 [2d Cir 1988]), a case cited by defendants, the jury's punitive awards totaling $185,000 for the plaintiff's section 1983 excessive force claim was upheld where the plaintiff was struck repeatedly about the head by two police officers while he was handcuffed and unable to defend himself.

In *Lee v Edwards* (101 F3d 805, 812-813 [2d Cir 1996]), the plaintiff's $200,000 punitive damage award, solely for his section 1983 malicious prosecution claim, was found to be excessive and reduced to $75,000. The court reasoned that while the defendant's conduct in filing a false offense report recording that the plaintiff had assaulted a police officer and resisted arrest was a reprehensible abuse of power, a comparison of other police misconduct cases revealed that $200,000 was an amount awarded in far more egregious cases (*id.* at 812).[8]

---

8. The court also held that plaintiff was entitled to punitive damages, notwithstanding the fact that the jury only awarded Lee $1 in compensatory damages on his malicious prosecution claim (101 F3d at 811). Here, while plaintiff would have been entitled to pursue recovery of compensatory dam-

In *Ismail v Cohen* (899 F2d 183, 185 [2d Cir 1990]), the plaintiff suffered two displaced vertebrae, a cracked rib, and serious head trauma after his encounter with a police officer who was threatening to write him a parking ticket for violating alternate side parking regulations. The plaintiff was held in custody for approximately 60 hours and was made to stand trial on charges of resisting arrest, obstructing governmental administration, and harassment. He brought section 1983 claims for assault, battery, false arrest, malicious prosecution and abuse of process, and was awarded $150,000 in punitive damages. The trial court found the award excessive, but the Second Circuit upheld it, noting that the plaintiff had had to face a criminal prosecution and suffered permanent physical and emotional injury (*id.* at 187).

Finally, in *King v Macri* (993 F2d 294 [2d Cir 1993]), the jury found that the plaintiff, who was in the hallway of the New York City Criminal Court in Manhattan, entered a courtroom looking for his attorney when he encountered two court officers, who demanded to see his identification. When the plaintiff produced his driver's license, one of the officers tore his license into pieces and attempted to arrest the plaintiff, which precipitated a struggle. The officers then punched the plaintiff repeatedly and used a choke hold on him before placing him under arrest and sending him to Rikers Island, where he was strip-searched and held for two months, awaiting trial on criminal charges that included resisting arrest and disorderly conduct. The plaintiff brought section 1983 claims for excessive force, false arrest, and malicious prosecution. On appeal, the jury's awards of $175,000 and $75,000 in punitive damages against the officers were reduced to $100,000 and $50,000 (*id.* at 299).

■ Based on the foregoing, we find that the amount of punitive damages awarded to plaintiff against Perez ($750,000) and Mendez ($750,000) deviates materially from what is reasonable, and should be reduced to $75,000 against each of them.[9]

The jury also awarded plaintiff $500,000 for past and $2,000,000 for future pain and suffering. The trial court held

_____

ages for his malicious prosecution claim (PJI 3:50), this issue was not submitted to the jury and is not raised on appeal.

**9.** We note that "punitive damages may not be awarded against a municipality" (2A NY PJI3d 3:60.4 at 689 [2016]). While the reduction of the jury's award for punitive damages is substantial, a $75,000 award against each individual defendant will, in our opinion, surely act as a deterrent against similar conduct in the future.

that these amounts were excessive, and conditionally reduced the awards for past and future pain and suffering to $200,000 and $150,000, respectively. While we agree that the jury awards for past and future pain and suffering were excessive, we find that the conditional amounts set by the trial court are not reasonable.

In *Pinto v Gormally* (109 AD3d 425 [1st Dept 2013], *lv denied* 22 NY3d 862 [2014]), this Court upheld a jury award of $200,000 for past pain and suffering and $400,000 for future pain and suffering (*Pinto v Gormally*, 2013 WL 6212563, *2 [Sup Ct, Bronx County 2013]) where the plaintiff laborer sustained fractures to his left hand after a box of tiles fell on his hand upon his slip and fall on stairs.

In *Figueroa v City of New York* (78 AD3d 463 [1st Dept 2010]), a jury award for past pain and suffering, which covered a period of 14 years, was reduced from $2.5 million to $1.25 million where the plaintiff sustained a fractured right hand and developed post-traumatic stress disorder after police "pointed a gun at him, 'smacked' him, hit him with the gun, stomped on him, and arrested him during an investigatory stop" (*id*. at 463).

In *Diouf v New York City Tr. Auth.* (77 AD3d 600 [1st Dept 2010]), the 55-year-old plaintiff "sustained painful fractures to both wrists" and was required to undergo two surgeries and a course of occupational therapy, which, nevertheless, left him with "reduced ranges of motion, tenderness and reduced grip strength" (*id*. at 600). A jury award of $800,000 for future pain and suffering was unanimously affirmed.

█ Given the evidence of plaintiff's fractured right hand and post-traumatic stress disorder, we find that an award of $400,000 for past pain and suffering and $1,250,000 for future pain and suffering is warranted.

Finally, plaintiff asserts that he is entitled to attorneys' fees pursuant to 42 USC § 1988 (b), as the prevailing party in an action pursuant to 42 USC § 1983. Specifically, he seeks $250,000 in attorneys' fees. Defendants concede that Supreme Court erred in "its blanket denial" of plaintiff's application for attorneys' fees.

In light of the fact that defendants have failed to set forth any argument challenging the amount of legal fees sought by plaintiff, and because the trial court failed to address this

issue, erroneously deeming it moot, the matter should be remanded to Supreme Court for a determination of legal fees.

Accordingly, the order of the Supreme Court, Bronx County (Howard H. Sherman, J.), entered March 18, 2014, which, to the extent appealed from as limited by the briefs, granted defendants-respondents' posttrial motion to set aside the jury verdict to the extent of vacating the punitive damages awards for violation of 42 USC § 1983 based on malicious prosecution and excessive force against Perez and Mendez respectively, dismissing the malicious prosecution and punitive damages claims, and ordering a new trial on compensatory damages on plaintiff's state law claim of excessive force, unless he stipulated to a reduction in damages for past pain and suffering from $500,000 to $200,000 and for future pain and suffering from $2,000,000 to $150,000, should be reversed, on the law and the facts, without costs, the state law malicious prosecution claim, the 42 USC § 1983 malicious prosecution claim and the punitive damages claim under 42 USC § 1983 reinstated, and a new trial ordered on damages unless plaintiff stipulates, within 30 days after service of a copy of this order with notice of entry, to a reduction of the jury awards for past and future pain and suffering to $400,000 and $1,250,000, respectively, and a reduction of the jury awards for punitive damages to $75,000 against Perez and $75,000 against Mendez, and to entry of a judgment in accordance therewith. The order of the same court and Justice, entered March 19, 2014, which denied as moot plaintiff's motion for attorneys' fees, should be reversed, on the law, without costs, the motion granted, and the matter remanded to Supreme Court for a determination of reasonable attorneys' fees.

Acosta, J.P., Saxe, Richter and Gische, JJ., concur.

Order, Supreme Court, Bronx County, entered March 18, 2014, reversed, on the law and the facts, without costs, the state law malicious prosecution claim, the 42 USC § 1983 malicious prosecution claim and the punitive damages claim under 42 USC § 1983 reinstated and a new trial ordered on damages unless plaintiff stipulates, within 30 days after service of a copy of this order with notice of entry, to a reduction of the jury awards for past and future pain and suffering to $400,000 and $1,250,000, respectively, and a reduction of the jury awards for punitive damages to $75,000 against Perez and $75,000 against Mendez and to entry of a judgment in accordance therewith.

Order, same court, entered March 19, 2014, reversed, on the law, without costs, the motion granted, and the matter remanded to Supreme Court for a determination of reasonable attorneys' fees.