Healthcare Professionals Ins. Co. v Parentis (2018 NY Slip Op 07224)





Healthcare Professionals Ins. Co. v Parentis


2018 NY Slip Op 07224


Decided on October 25, 2018


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: October 25, 2018


[*1]HEALTHCARE PROFESSIONALS INSURANCE COMPANY, Respondent,
v
MICHAEL A. PARENTIS et al., Appellants, and MEDICAL LIABILITY MUTUAL INSURANCE COMPANY, Respondent.

Calendar Date: September 5, 2018

Before: McCarthy, J.P., Lynch, Clark, Mulvey and Rumsey, JJ.


Phillips Lytle LLP, Buffalo (William J. Brennan of counsel), for appellants.
McNamee Lochner, PC, Albany (Christopher Massaroni of counsel), for Healthcare Professionals Insurance Company, respondent.
Rivkin Radler LLP, Uniondale (Michael P. Versichelli of counsel), for Medical Liability Mutual Insurance Company, respondent.



MEMORANDUM AND ORDER
Lynch, J.
Appeal from an order of the Supreme Court (Platkin, J.), entered September 26, 2017 in Albany County, which, among other things, granted motions for summary judgment by plaintiff and defendant Medical Liability Mutual Insurance Company.
After fracturing his ankle at work in October 2004, defendant Donald Schultz was initially treated by Andrew C. Stoeckl, an orthopaedic surgeon. He then began treatment with defendant Michael A. Parentis, and, after numerous surgeries, he underwent an above-the-knee leg amputation. In February 2014, a jury awarded Schultz and his then-wife, defendant Katherine Schultz, a verdict in a medical malpractice action totaling $8.6 million against Parentis, and returned a no cause of action against Stoeckl (hereinafter the Schultz action). The verdict was upheld on appeal (Schultz v Excelsior Orthopaedics, LLP, 129 AD3d 1606, 1607 [2015]). At the time of the verdict, Parentis had liability insurance coverage totaling $2.3 million per claim through a $1.3 million primary policy with defendant Medical Liability Mutual Insurance Company (hereinafter MLMIC) and a $1 million excess policy with plaintiff. MLMIC also insured Stoeckl for $1.3 million.
Plaintiff commenced this declaratory judgment action seeking a determination that it acted in good faith during settlement negotiations in the Schultz action and that its obligation to indemnify Parentis is limited to the policy. Parentis brought a counterclaim against plaintiff and [*2]a cross claim against MLMIC alleging that both carriers acted in bad faith in failing to settle the Schultz action within the policy limits. With MLMIC limiting its argument to the issue of causation, Supreme Court granted plaintiff's and MLMIC's motions for summary judgment and dismissed Parentis' bad faith claim against them. Parentis and the Schultzes now appeal.
We reverse. To establish bad faith in failing to settle a liability claim, the insured must show that "the insurer's conduct constituted a 'gross disregard' of the insured's interests — that is, a deliberate or reckless failure to place on equal footing the interests of its insured with its own interests when considering a settlement offer" (Pavia v State Farm Mut. Auto. Ins. Co., 82 NY2d 445, 453 [1993]). Stated otherwise, the "plaintiff must establish that the defendant insurer engaged in a pattern of behavior evincing a conscious or knowing indifference to the probability than an insured would be held personally accountable for a large judgment if a settlement offer within the policy limits were not accepted" (id. at 453-454). It must be shown that "the insured lost an actual opportunity to settle the claim at a time when all serious doubts about the insured's liability were removed" (id. at 454 [internal quotation marks, ellipsis and citations omitted]). Pavia instructs that it is necessary to consider all the facts and circumstances in gauging whether an insurer acted in bad faith in addressing settlement. Key factors include the plaintiff's likelihood of success, the potential magnitude of a verdict and the corresponding financial burden on the insured and the information available to the insurer at the time the settlement demand was made (see Smith v General Acc. Ins. Co., 91 NY2d 648, 653-655 [1998]; Pavia v State Farm Mut. Ins. Co., 82 NY2d at 454-455; PJI 4:67). In reviewing these factors in the procedural context of a motion for summary judgment, we review the evidence in a light most favorable to the nonmoving party, here, Parentis and the Schultzes (see De Lourdes Torres v Jones, 26 NY3d 742, 763 [2016]; Vega v Restani Constr. Corp., 18 NY3d 499, 503 [2012]).
In Pavia, the Court of Appeals determined that the evidence was insufficient to establish a prima facie case of the insurer's bad faith. There, the plaintiff's attorney made a 30-day settlement demand that expired prior to trial at a point when the insurer was still investigating "several significant questions about the insured's liability" (Pavia v State Farm Mut. Auto. Ins. Co., 82 NY2d at 455-456). Moreover, after completing its review, the insurer offered its policy prior to trial in accord with the plaintiff's demand only to have the offer rejected as too late (id.). The timing factor here is far different.
In affirming the verdict in the Schultz action, the Fourth Department characterized the trial evidence as "a prototypical battle of the experts" within the reasoned province of the jury to resolve (Schultz v Excelsior Orthopaedics, LLP, 129 AD3d at 1607 [internal quotation marks and citation omitted]). We agree with that characterization, for each side presented plausible expert testimony as to the viability of the medical malpractice claim. That said, the gravity of the injury was manifest, and the record shows that MLMIC, as the primary insurer in control of the defense, was fully cognizant, early on, of the potential for an unfavorable verdict. MLMIC's in-house orthopedic expert, Kendrick Sears, evaluated the case in 2012 and described the medical history under Parentis as "a mess." Without identifying a particular point where Parentis deviated from the standard of care, Sears noted, "The exception I would suppose would be to having started this whole cascade." Sears concluded his comments by recommending that the case be reviewed by a specialist in foot and ankle surgery, while noting his concern that the case would "end up being settled because of the inability to find a point of defense." In fact, MLMIC subsequently retained and presented the trial testimony of such an orthopedic specialist, Eric Blumer. After Blumer indicated that the case was defensible, MLMIC's trial counsel, Bruce Weidner, assessed the chances of successfully defending the claim "to be better than fifty-fifty." Notably, as the case progressed, Weidner sent periodic pretrial reports to MLMIC which, in turn, were forwarded to plaintiff. In addition to potential liability, the reports discussed the Schultzes' claimed damages for pain and suffering, loss of consortium and economic losses that greatly exceeded the coverage. Donald Schultz was 36 years old when he fractured his ankle.
As for settlement demands, the record shows that in September 2011, the Schultzes' trial counsel, Jeffrey Black, made a demand at a pretrial conference to settle the case against both Parentis and Stoeckl for the policy limits. At a court conference in June 2012, Black specified [*3]that the demand as against Parentis was $2.3 million. This demand was repeated at several conferences prior to trial. While plaintiff and MLMIC contend that only a combined demand of $3.6 million was made to globally settle both the Parentis and Stoeckl claims, Black explained that the settlement demands were "broken out separately" with respect to both doctors, although he was "not sure" whether he indicated prior to jury selection whether he would settle "against one doctor to the exclusion of the other." It is undisputed that at no point prior to trial did the defense respond with any counteroffer to settle.
The pivotal moment came during jury deliberations, which began during the early afternoon on February 4, 2014. After a little more than an hour, the jury sent out a note at 2:24 p.m. pertinent to question No. 6 on the verdict sheet, requesting a breakdown of the life care plan expenses for Donald Schultz's future care, which totaled about $1.1 million. Following a readback of the relevant testimony, the jury resumed deliberations at 2:56 p.m. Shortly thereafter, Weidner advised Parentis for the first time to pursue settlement and obtained Parentis' immediate consent, as well as confirmation from Black that the Schultzes would settle for the coverage of $2.3 million against Parentis, subject to consent from the workers' compensation carrier, which Black explained was "not an issue." Weidner so informed MLMIC's field representative, Domenick Callocchia, who was at the courthouse. This information was shared with MLMIC's claims examiner, Keith Vaverchak, who explained the status of the case in an email to his superiors at 3:22 p.m., pointing out that the jury's note on question No. 6 "would lead one to believe it is as bad as it seems," that Weidner "had an obligation to his client to inquire if [the Schultzes'] counsel would consider settlement . . . since it is clear that the damages claimed exceed all the policy limits" and that the Schultzes would settle for $2.3 million from Parentis, but take a verdict from Stoeckl.
Notably, Vaverchak copied plaintiff's vice-president of claims, Grace Morgan, on his 3:22 p.m. email. What transpired in the conversations between Vaverchak and Morgan is in conflict. Vaverchak explained that he had already spoken with Morgan and repeated the substance of their conversation in the email. After discussing the content of the email with Callocchia and Vaverchak, Gerald Glum, MLMIC's vice-president of claims, instructed Vaverchak to inform Morgan that MLMIC would pay its policy and that it would take plaintiff's policy in order to settle the case. Vaverchak then called Morgan minutes after sending the email to advise that MLMIC was offering its policy to settle the case, and that "the ball was in her court" to include plaintiff's policy to complete the settlement. Vaverchak reported back that Morgan decided to await further jury deliberations. In contrast, Morgan initially denied getting the second call but, in any event, asserted that Vaverchak never advised that MLMIC offered its policy to settle and that she did not learn that Parentis signed a consent until after the jury's verdict. In the meantime, at 3:29 p.m., the jury issued a note indicating that it had reached a verdict. Weidner explained that he received word from Callocchia that MLMIC had agreed to offer its $1.3 million policy, but that plaintiff was "not prepared to make any offer." No request was made for additional time to finalize a settlement and Weidner was instructed to take a verdict. The jury returned to the courtroom at 3:42 p.m. and the verdict was rendered.
In opposing plaintiff's and MLMIC's respective motions, Parentis and the Schultzes submitted the affidavit of an expert, Bernd Heinze, who opined that each carrier breached its duty of good faith and failed to comply with industry standards by not keeping Parentis properly informed as to the risk of an excess verdict, by failing to even address settlement prior to trial and by failing to offer their policies "despite the significance of the jury's note, defense counsel's recommendation to settle and . . . Parentis' consent to settle." "The failure by the insurer to follow an industry practice or its own standard is relevant to resolution of the bad faith issue" (Smith v General Acc. Ins. Co., 91 NY2d at 655). While an insurer cannot be compelled to settle a questionable claim, the failure to even address the settlement demand or communicate the demand to Parentis before the jury's note on question No. 6 is a factor that a jury can consider as some evidence of bad faith (see id. at 694).
In our view, the circumstances described above raise a question of fact as to whether plaintiff and MLMIC acted in bad faith in failing to settle this case despite the opportunity to do [*4]so. Each points the finger at the other for failing to finalize a settlement, and the factual discrepancy as to the information shared and conversations held between Vaverchak and Morgan are for a factfinder to determine at trial. It was clear from the inception of this case that if a jury held Parentis accountable, the verdict would exceed the total coverage — and that, indeed, was the Schultzes' settlement position throughout. As such, it was incumbent upon both plaintiff and MLMIC to be fully engaged and attentive to the case, particularly after the jury highlighted question No. 6 on the verdict sheet. To suggest that there was not enough time to respond is unpersuasive. This was crunch time, the stakes were unquestionably high and both plaintiff and MLMIC had a contractual responsibility to fulfill. By their account, Weidner, Parentis and the MLMIC representatives came to a consensus to accept the Schultzes' settlement demand and so informed Morgan. Although disputed by Morgan, if true, she had an obligation to timely respond but balked and failed to engage Mark Morris, plaintiff's chief executive officer who supervised the claims department, in the settlement discussion. Morris confirmed that he had authority to approve a settlement in an urgent situation and was available by cell phone. Morris also explained that, in determining whether to settle, he would rely mainly on the position of the primary carrier, MLMIC. We recognize that MLMIC controlled the litigation, but, given the prevailing circumstances of the case, plaintiff was equally obligated to remain informed and prepared to respond. On the other hand, if Morgan's testimony were accepted — that MLMIC never informed her that it had determined to accept the settlement and offer its policy — then plaintiff's obligation to offer its policy was not triggered, leaving open the question of whether MLMIC acted in bad faith for failing to offer its policy. As it turns out, neither MLMIC nor plaintiff responded to the Schultzes' settlement demand, except to advise, according to Black, that the offer was "zero." As such, we conclude that Supreme Court erred in granting the motions for summary judgment and that the issue of bad faith remains a factual question for resolution at trial.
Clark, Mulvey and Rumsey, JJ., concur.




McCarthy, J. (concurring).


This action concerns whether two insurance companies — defendant Medical Liability Mutual Insurance Company (hereinafter MLMIC), as primary insurer with a $1.3 million coverage limit, and plaintiff, as excess insurer with a $1 million coverage limit — acted in good faith and in the best interests of their insured, defendant Michael A. Parentis, during settlement negotiations in the underlying medical malpractice action brought against him by defendants Donald Schultz and Katherine Schultz (hereinafter the Schultz action). While I agree with the majority that neither plaintiff nor MLMIC established its entitlement to summary judgment, I write separately because I believe that the motions by plaintiff and MLMIC must be considered independently and that the triable questions of fact are narrower than the majority suggests.
Initially, the majority contends that a jury could consider as some evidence of bad faith plaintiff's and MLMIC's acts or omissions from the time that the Schultz action was commenced. In its summary judgment motion, however, MLMIC limited its argument to the issue of causation. Under that posture, even if we assume that MLMIC acted in bad faith, the question is whether that bad faith caused Parentis to be deprived of an opportunity to settle when all serious doubt about his liability was removed. Thus, the expert affidavit submitted by Parentis and the Schultzes, which mainly addressed whether plaintiff and MLMIC breached their duty of good faith, did not resolve the element at issue. And regardless of whether MLMIC acted in bad faith, plaintiff had no obligation pursuant to its policy terms to offer any money under its excess insurance policy until MLMIC tendered the policy limits of its primary policy. These concepts narrow the focus on these motions.
For Parentis to prevail on his bad faith insurance claims against both plaintiff and MLMIC, or either of them, he had to show that he "lost an actual opportunity to settle the claim at a time when all serious doubts about [his] liability were removed" (Pavia v State Farm Mut. Auto. Ins. Co., 82 NY2d 445, 454 [1993] [internal quotation marks, ellipsis and citations [*5]omitted]). Regardless of what happened in the years leading up to the medical malpractice trial, the record establishes that all serious doubts about Parentis' liability were not removed until the jury sent out its note seeking information related to the life care plan, indicating that the jury had found liability and was deliberating regarding damages. Up until that point, Parentis, his counsel Brian Weidner, and the representatives from MLMIC all felt that the case was defensible and they were optimistic. Thus, the only relevant possible lost opportunity to settle was on February 4, 2014 between, at most, 2:24 p.m. (when the jury sent out the life care plan note) and 3:44 p.m. (when the verdict was read in court). We must look at what occurred during that time period when separately considering whether plaintiff and MLMIC breached their duty to Parentis.
As with all summary judgment motions, we must view the evidence in a light most favorable to the nonmoving parties — Parentis and the Schultzes — and draw every available inference in their favor (see De Lourdes Torres v Jones, 26 NY3d 742, 763 [2016]). In the present situation, where there are two summary judgment motions, that standard requires that we view the evidence separately on each motion, because different evidence may be more favorable to the nonmoving parties depending on the context of which insurer is the movant.
MLMIC is the primary insurer, so I begin with its motion. After the jury received a response to its note, it resumed deliberations at 2:56 p.m. As the majority notes, at that time Weidner advised Parentis to settle and obtained his consent. Weidner then confirmed with the Schultzes' counsel that they would settle with Parentis for his combined primary and excess insurance coverage limits of $2.3 million. This information was provided to MLMIC's field representative present in the courthouse, who shared it with MLMIC's claims examiner, Keith Vaverchak, and other superiors. In his deposition, Vaverchak testified that he sought approval from his superiors to settle for the primary policy limits, and also contacted plaintiff's vice-president of claims, Grace Morgan, with information about the jury note and that MLMIC was seeking authorization to settle for its policy limits.
Vaverchak and Morgan presented conflicting versions regarding the number and content of phone conversations that occurred between them during the jury's deliberations. On a motion for summary judgment, we cannot make credibility determinations and must accept as true the testimony that favors the nonmoving parties, even if the record contains conflicting information, so long as an issue is not clearly feigned (see Torgersen v A & F Black Cr. Realty, LLC, 158 AD3d 1042, 1044 [2018]; Hall v Queensbury Union Free Sch. Dist., 147 AD3d 1249, 1252 [2017]). Morgan testified that Vaverchak never informed her that MLMIC was tendering its policy limits. On this motion, we must accept the evidence in the record supporting inferences that MLMIC knew that the Schultzes had indicated that they would not settle for less than the full policy limits of both the primary and excess policies and that an MLMIC employee was acting on behalf of both plaintiff and MLMIC as the point person in the courthouse to inform them of developments. To negotiate a settlement in good faith within this framework, MLMIC had to not only tender its own policy limits, but also inform plaintiff of that tender and of the Schultzes' expressed position that a settlement would require plaintiff to offer its policy limits as well. Even if plaintiff would not offer anything, MLMIC could have approached the Schultzes, explained the situation and sought to negotiate a settlement for the policy limits of the primary policy. Viewing the evidence in a light most favorable to Parentis and the Schultzes in relation to MLMIC's motion, the record presents questions of fact as to whether MLMIC acted in good faith. Accordingly, MLMIC was not entitled to summary judgment.
To address the motion by plaintiff, as the excess insurer, the evidence must be viewed in a different light. If this Court accepted Morgan's testimony that MLMIC never tendered its policy, then plaintiff's obligation to offer any portion of its policy was never triggered. Therefore, when reviewing plaintiff's motion, we must instead accept the version of events relayed by Vaverchak, as supported by phone records, emails and other evidence. Vaverchak testified that he called Morgan twice during deliberations, with the first call beginning more than 50 minutes before the jury returned to the courtroom with its verdict. He testified that he explained the substance of the jury note, that Weidner was inquiring whether the Schultzes would settle for the combined policy limits, that MLMIC was considering and planning to tender [*6]its policy and he asked for plaintiff's position. Though Vaverchak had not obtained authority to tender MLMIC's policy, he was warning Morgan of what was occurring, that he anticipated tender of MLMIC's policy and that MLMIC and Weidner would be requesting plaintiff's policy as well, to obtain a settlement. According to Vaverchak, Morgan said that she did not think plaintiff was in a position to offer anything that late, meaning that she would not be able to get authority to settle.
Vaverchak also called Morgan a second time, clearly informed her that MLMIC was tendering its policy limits and sought plaintiff's position on offering the excess policy limits as well, letting her know that the ball was in her court. According to Vaverchak, Morgan stated that she felt there should be more questions from the jury to indicate which way they were leaning, that it seemed early in the deliberations and that plaintiff would take a wait-and-see approach. Although Vaverchak testified that he thought Morgan was saying that she was unable to obtain authority to settle, in a draft email that Morgan prepared but did not send, she wrote that she was not unwilling to obtain authority but felt that it was not strategic at that point and it was worth waiting for better hints from the jury. That email implies that she could have obtained authority to settle had she attempted to do so. Plaintiff's chief executive officer, who could have granted Morgan the authority, testified that he was available by phone that day. Considering this evidence in a light most favorable to Parentis and the Schultzes on plaintiff's motion, the record contains factual issues concerning whether Morgan and plaintiff had the time and ability to approve an offer of plaintiff's policy limits, but instead chose to wait and see what the jury would do. If that is true, plaintiff's actions could be considered a reckless disregard of the interests of Parentis, which could constitute bad faith (see Pavia v State Farm Mut. Auto. Ins. Co., 82 NY2d at 453). Therefore, plaintiff did not establish its entitlement to summary judgment.
By separately reviewing the evidence on each motion, I conclude that there are questions of fact precluding summary judgment as to both plaintiff's and MLMIC's good faith, but only for the period of time after the jury sent out its note regarding the life care plan. Hence, I would narrow the scope of the action to that time period.
ORDERED that the order is reversed, on the law, with costs, motions denied, and defendant Michael A. Parentis' claim regarding bad faith reinstated.